IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANJI LYNN BAKER,

    Petitioner,     No. CIV S-01-0804 LKK JFM P

 vs.

GAIL LEWIS,

    Respondent.   FINDINGS AND RECOMMENDATIONS

_____/

   Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  By this action, petitioner challenges his 1996 conviction for two counts of sodomy, California Penal Code § 286(c), and one count of forced oral copulation under Penal Code § 288a(c).  (CT 321-23.)  The jury also found petitioner had committed one count of the forcible sex acts under conditions bringing it within the sentencing provisions of California Penal Code § 667.61(c).  (CT 324.)  Petitioner was sentenced to 26 years in prison – consecutive upper terms of eight years for each of the two sodomy and one oral copulation convictions and two years for a violation of probation in a prior drug offense.  (CT 353.)  Petitioner raises multiple claims that his conviction violates the Constitution.

   After review of the record in this action, including the lodged records of the state court, this court has determined that the petition for writ of habeas corpus should be denied.

I. Procedural Background

Petitioner appealed his conviction to the California Court of Appeal, Third Appellate District, and on August 12, 1998, that court affirmed the judgment. (Respondent's Answer, Ex. D.)  On September 17, 1998, petitioner filed a petition for review in the California Supreme Court. (Id., Ex. E.)  On November 24, 1998, the Supreme Court granted petitioner's petition for review but held it in abeyance pending a decision in another case. (Id., Ex. F.)  On December 15, 1999, the California Supreme Court dismissed review and remanded the case to the Court of Appeal. (Id., Ex. G.)  The Court of Appeal affirmed their opinion. (Answer at 2.)

On February 14, 2000, petitioner filed a petition for writ of certiorari in the United States Supreme Court on the sole claim of whether admission of prior bad acts (sex crimes) to prove criminal disposition violates the due process clause. (Answer, Ex. H; Petition, Ex. C.)  On June 5, 2000, the United States Supreme Court denied the petition. (Answer, Ex. J.)

On December 28, 2000, petitioner filed a petition for writ of habeas corpus in the California Supreme Court. (Petition, Ex. D; Answer, Ex. K.)  That petition was summarily denied on March 28, 2001. (Answer, Ex. L.)

On April 26, 2001, petitioner filed the instant action in propria persona.  By order filed July 22, 2002, this matter was stayed pending exhaustion of state remedies.

On July 15, 2002, petitioner filed a petition for writ of habeas corpus in the California Supreme Court. (Answer, Ex. M.)  On February 19, 2003, the petition was denied as untimely and successive. (Answer, Ex. N.)

On June 16, 2003, after denial of a previous motion to amend and re-opening of this action, petitioner filed a document which the court construed as a motion to amend. Petitioner's motion to amend was partially granted on July 30, 2003, and the proposed first amended petition submitted by petitioner in propria persona was ordered filed (Docket No. 38). The following claims are presently pending in this action (retaining the numbering contained in petitioner's first amended petition):

1. Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the trial court's decision to permit testimony from witnesses who were not victims in the instant action and by denying petitioner evidence that might have led a reasonable jury to find in his favor.

2. Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments were violated by several trial court errors, including rulings that shifted the burden of proof to the defense, failure to cure prejudicial prosecutorial error by admonishment, admission of irrelevant photographs, bias and removal of a black male juror from the panel, and admission of evidence of alleged prior crimes that had been fully litigated and had not resulted in convictions.

3. Petitioner's rights under the Sixth and Fourteenth Amendments were violated by the trial court's admission of propensity evidence.[1]

4. Petitioner's Sixth Amendment rights were violated by the trial court's denial of his Wheeler/Batson motion.

5. Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the admission of evidence of prior criminal proceedings against petitioner, none of which resulted in a conviction.

6. Petitioner received ineffective assistance of trial counsel, and the trial court erred in denying his Marsden motion.

7. Petitioner received ineffective assistance of appellate counsel when his appellate attorney failed to raised claims of prosecutorial misconduct.[2]

11. Petitioner received ineffective assistance of appellate counsel when his appellate attorney failed to raise a claim based on the alleged improper admission of photographic evidence.

(See July 30, 2003 Order at 8-9.) On September 15, 2003, respondent filed an answer and on December 1, 2003, petitioner filed his traverse pro se. On April 21, 2004, petitioner's motion for substitution of counsel was granted and counsel was appointed to represent petitioner. On

---

[1] Petitioner was denied permission to amend to include a challenge to the use of jury instruction CALJIC 2.50.01; that portion of claim three is omitted. (See July 30, 2003 Order at 9.)

[2] Petitioner was denied permission to amend to include claims 8, 9, 10 and 12; those claims are omitted. (See July 30, 2003 Order at 9.)

December 20, 2004, counsel for petitioner filed a supplemental memorandum of points and

authorities in support of the traverse.  Because many of the claims presented by petitioner in his

pro se pleadings overlap, the court will address the claims as presented by petitioner's counsel in

the supplemental memorandum of points and authorities.  Petitioner's claim that he suffered

ineffective assistance of appellate counsel will be addressed last.

II.  Factual Background[3]

       At the inception of the jury trial, the prosecutor filed a motion to
allow evidence of prior sex offenses by [petitioner] (for which
[petitioner] was not convicted) pursuant to sections 1108[4] and
1101, subdivision (b).[5]  [Petitioner] sought exclusion of the
evidence.  The trial court ruled some of the evidence admissible,
under section 1108, but not section 1101, subdivision (b).

       The evidence adduced at trial, with respect to the charged
offenses, showed as follows:

       The victim 20-year-old Theresa A., testified that on September 1,
1995, around 8 a.m., she went to a local homeless shelter for coffee
and doughnuts.  [Petitioner], who was a stranger, approached in his
Volkswagen convertible and beckoned her.  They talked for about
20 minutes and then she accompanied him to a store where he
bought cigarettes and vodka.  They drove to Miller Park and

---

   [3]  The following summary is drawn from the August 12, 1998 opinion by the California
Court of Appeal, Third Appellate District, in People v. Baker, C024609, at 3-10, appended as Ex.
D to Respondent's Answer (hereafter "slip op.").

   [4]  Section 1108 provides in part:  "(a) In a criminal action in which the defendant is
accused of a sexual offense, evidence of the defendant's commission of another sexual offense or
offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant
to Section 352. . . ."

   [5]  Section 1101 provides:  "(a)  Except as provided in this section and in Sections 1102,
1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether
in the form of an opinion, evidence of reputation, , or evidence of specific instances of his or her
conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.
   "(b)  Nothing in this section prohibits the admission of evidence that a person committed
a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity,
intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a
defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not
reasonably and in good faith believe that the victim consented) other than his or her disposition
to commit such an act.
   "(c)  Nothing in this section affects the admissibility of evidence offered to support or
attack the credibility of a witness."

continued conversing.  During their time there, they shared a "friendly hug."

At trial, the victim testified [petitioner] tried to kiss her, but she pulled away.  When reminded of her preliminary hearing testimony, she recalled [petitioner] did kiss her briefly, but she did not kiss back.  She initially felt flattered by [petitioner's] attention but began to feel uncomfortable.  [Petitioner] pulled out a knife to adjust his car stereo speaker.  A friend of [petitioner] came by and chatted with him.  The friend testified at trial that he assumed the victim was [petitioner's] girlfriend, though he did not see them touch.  After the friend left, [petitioner] and the victim got in the car (the convertible top of which was down) to leave.  [Petitioner] pulled the knife on the victim, holding the blade near her rib.  She saw a Sheriff's bus and clean-up crew nearby, but she was afraid and did not try to escape.  When she asked [petitioner] why he was doing this, he responded "It's the gangster in me."

[Petitioner] drove to a grassy area off of Front Street and ordered her out of the car.  He led her down a dirt path to a mattress on the ground.  He told her to undress.  She did so because of his "dirty looks" and the knife.  [Petitioner] told her to "suck his dick."  The victim tried to dissuade him, but succumbed because she was afraid.  [Petitioner] held the knife in his hand during the oral copulation.  Defendant also sodomized the victim, though she said "Please don't."  He sodomized her twice during the assault, which lasted for hours.  The victim testified she burned herself with the cigarette on her wrist, in response to [petitioner's] order to do so.

Afterwards, [petitioner] drove the victim home, stopping to buy cigarettes on the way.  She was in pain and waited in the car.  [Petitioner] did not act like anything was wrong.  When he dropped her off, he told her he would return at 4 p.m.  She openly took a paper with his name on it, planning to have him arrested.

The victim called the police.  She had abrasions on her buttocks, semen on her lip and anus, and a tear around the rectum.  The physical findings were consistent with forcible sodomy.

The police testified that [petitioner], upon his arrest, said he had been working in Woodland.  While handcuffed, he tried to reach into his back pocket.  He told police he was reaching for his wallet, but the pocket contained only a knife.  [Petitioner's] employer testified he did not work that day.

Before the victim's testimony at trial, three other women testified to prior sexual assaults by [petitioner], which were not charged offenses in this case, as follows:

Ida J., testified she first met [petitioner] in a laundromat in August 1983.  They talked.  The next morning, she went to his

apartment, as he had offered to buy her breakfast.  She accompanied him to a store for alcohol.  Back at [petitioner's] place, he drank the alcohol, pulled a gun on Ida, told her to undress, raped her, sodomized her, and forced her to orally copulate him.  After a couple of hours, he let her leave, and she called the police.  The investigating officer testified in the present trial that an air pistol was found in [petitioner's] apartment, and that [petitioner] claimed Ida had consented to the sex, asked for money, and became angry when [petitioner] said he did not have any money and asked if she were a prostitute.  [Petitioner] told police he displayed the gun because she threatened to send over a "dude."  Cross-examination of Ida in the present trial revealed that at the time of her encounter with [petitioner], Ida was 42 years old (about 20 years older than [petitioner]), the mother of six grown children, and had recently left her husband.  Pursuant to stipulation, the jury in the present case was told that [petitioner] was criminally prosecuted on Ida's complaint and went to trial, and the jury returned deadlocked, with a ten-to-two vote in favor of acquittal.  The trial court granted the prosecution's motion to dismiss the case due to insufficient evidence.[6]

Amber H. testified she lived in the same neighborhood as [petitioner] in August 1987, when she agreed to go for a ride with him.  [Petitioner] hinted they might have sex, to which Amber indicated maybe, because she thought he might leave her stranded if she said no.  [Petitioner] purchased cocaine, and they went to his friend's home and watched television.  Amber voluntarily kissed [petitioner].  Later, [petitioner] and Amber returned to her apartment, which had almost no furnishings because she was in the process of moving.  They sat on a blanket and watched television.  When she brought him a glass of water, [petitioner] pulled off her tank top.  She bolted for the door.  He stopped her.  She screamed.  He pushed her against the wall, choked her, threw her to the floor, and hit her in the head with a broomstick.  [Petitioner] forced her to orally copulate him.  She vomited.  [Petitioner] alternated between putting his penis in her vagina and her mouth.  He continuously slapped her and wanted her to say "Hit me hard, Daddy."  [Petitioner] tried to sodomize her but stopped when she screamed.  When [petitioner] left, he took her television to insure she would not leave.  Amber called the police.

The investigating officer testified in this trial that [petitioner] claimed Amber had consented to the sex acts.  On cross-examination, the defense elicited from Amber that at the time of the incident with [petitioner] in 1987, Amber was sexually active and was pregnant by a man whom she did not consider to be a boyfriend.  Amber also acknowledged she knew some karate

---

[6] [Petitioner] repeatedly and very wrongly characterizes this as an acquittal.  Of the three prior offenses, there was only one acquittal, not the two acquittals he claims on appeal.

moves, but she did not try them on [petitioner].  The jury in the
present case was told that criminal charges were brought
concerning the Amber incident, but she was unable to travel to
Sacramento for trial because her baby was due to be born, and the
case was dismissed and was never refiled.

    Nicole R. testified she was an acquaintance of [petitioner] in
November 1994, when he said he could help her with her job
search.  They met at night at her boyfriend's deserted office, where
she was residing.  They had pizza and [petitioner] consumed
alcohol and marijuana.  [Petitioner] said he "wanted" her, but she
said no.  [Petitioner] watched a video while Nicole, who was not
feeling well, fell asleep at one end of the couch.  She woke to find
[petitioner] pulling at her pants.  She tried to scream.  [Petitioner]
threatened to break her neck.  He alternated between putting his
penis in her mouth and her vagina.  He tried to sodomize her, but
she jerked away, and he did not continue.  After about four hours,
[petitioner] folded her clothes, emptied the trash, and left.  Nicole
called the police.  The jury in the present case was told that
criminal charges were brought against [petitioner] concerning
Nicole's accusation, and he was acquitted by a jury.

    In the present case, [petitioner] testified in his own behalf.  He
admitted a prior felony conviction for possession of narcotics for
sale.  Regarding the present charged offenses, [petitioner] denied
the kidnaping and weapon use.  He admitted the sex acts but said
they were consensual.  According to [petitioner], the victim was
accidentally burned on the wrist when he tried to light her cigarette
with his and an ash fell on her wrist.  [Petitioner] said that after
sex, the victim expressed interest in a relationship and concern that
[petitioner] was "brushing her off."  She complained her husband,
who was in jail, was physically abusive.  [Petitioner] said he gave
her a social security paper to reassure her he would see her again.
After dropping off the victim, [petitioner] drove to his workplace,
where he was scolded for missing work.  He then went to his
wife's home (from whom he was estranged) to pay child support,
and was on his way to his girlfriend's house when the police
stopped him.  He told the police he was coming from work, not
that he had been working.  He testified he told the police about the
knife in his pocket, and he tried to reach for the knife only to hand
it over to the officer.

    Regarding the three women who made accusations of prior
offenses against him, [petitioner] admitted the sex but claimed
each woman was a willing participant.  He claimed Ida only
brought charges in retaliation for not getting paid for sex.  He said
Amber and he got along fine until the cocaine ran out and her
demeanor changed, though he did not think she was angry at him.
[Petitioner] testified he did not remember but thought he may have
taken Amber's television at her request, to sell it for money to buy
cocaine.  He did not remember telling a detective that he took it to

make sure this was not a one-night stand.  [Petitioner] said Nicole told him she was not a "one night stand," but he thought they parted on good terms.  [Petitioner] introduced evidence that Amber and he both tested positive for cocaine on the date of that incident, and that Nicole tested positive for methamphetamine.

Karen C. testified [petitioner] was formerly her boyfriend, and he never forced her to do anything she did not want to do.  She voluntarily engaged in vaginal, anal and oral sex with him.  At times, she told him to stop, and he stopped.

[Petitioner's] friend, Donald White, testified he never knew [petitioner] to force a woman to leave with him but did not know what [petitioner] did behind closed doors.

The jury returned guilty verdicts on count two (forcible sodomy), count three (forcible oral copulation), and count four (forcible sodomy).  The jury also found true the allegation that [petitioner] had committed at least one act within the meaning of Penal Code section 667.61, subdivision (c).  The jury did not reach a unanimous verdict on count one (kidnaping) or the weapon enhancements, and the court declared a mistrial.

People v. Baker, slip op. at 3-10.

III.  General Standards

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the  Supreme Court and nevertheless arrives at

/////

1   different result.  Early v. Packer, 573 U.S. 3, 8 (2002) (quoting Williams v. Taylor, 529 U.S. 362,

2   405-406 (2000)).

3            Under the  "unreasonable application" clause of section 2254(d)(1), a federal

4   habeas court may grant the writ if the state court identifies the correct governing legal principle

5   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

6   prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

7   simply because that court concludes in its independent judgment that the relevant state-court

8   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

9   application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

10   (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

11   question, is left with a 'firm conviction' that the state court was 'erroneous.'")

12            The court looks to the last reasoned state court decision as the basis for the state

13   court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

14   court reaches a decision on the merits but provides no reasoning to support its conclusion, a

15   federal habeas court independently reviews the record to determine whether habeas corpus relief

16   is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

17   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

18   reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

19   AEDPA's deferential standard does not apply and a federal habeas court must review the claim

20   de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

21   1167 (9th Cir. 2002).

22   /////

23   /////

24   /////

25   /////

26   /////

IV.  Petitioner's Claims

        A.  Right to Representative Jury (Batson/Wheeler)(Claims 2(c) & 4)

        Petitioner claims his Sixth Amendment rights were violated by the trial court's denial of his Wheeler motion.[7]  The California Court of Appeal fairly summarized the facts surrounding this claim as follows:

>     The Supreme Court recently reiterated the *Wheeler* principle in *People v. Jackson* (1996) 13 Cal.4th 1164, which stated:
>
>     "'[P]eremptory challenges may not be used to remove prospective jurors solely on the basis of presumed group bias. . . . [T]he Equal Protection Clause forbids peremptory challenges of potential jurors solely on account of their race when [petitioner] is a member of that race. . . .  [¶] . . . [I]f a party believes his opponent is improperly using peremptory challenges for a discriminatory purpose, he must raise a timely challenge and make a prima facie case of such discrimination.  Once a prima facie case has been shown, the burden shifts to the other party to come forward with an explanation that demonstrates a neutral explanation related to the particular case to be tried. . . . [¶] . . . [W]e will "rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." . . .  The trial court, however, must make "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily. . . .'"'  (*People v. Jackson*, *supra*, 13 Cal.4th at pp. 1195-1196.)

---

    [7]  In People v. Wheeler, 22 Cal. 3d 258 (1978), the California Supreme Court held that peremptory challenges may not be used to exclude from a jury all or most members of a cognizable group solely on the ground of presumed "group bias."  Wheeler is the "California analogue to Batson v. Kentucky[, 476 U.S. (1986)]."  Lewis v. Lewis, 321 F.3d 824, 827 & n.5 (9th Cir. 2003).  Wheeler differs from Batson in placing a more onerous burden of proof on petitioner in establishing a prima facie case of discrimination ("strong likelihood" vs "raise an inference").  See Cooperwood v. Cambra, 245 F.3d 1042, 1046-47 (9th Cir. 2001); Wade v. Terhune, 202 F.3d 1190, 1192 (9th Cir 2000) ("We hold that the *Wheeler* standard, as currently interpreted by the California courts, does not satisfy the constitutional requirement laid down in Batson.").  Here, however, the state trial court's finding that petitioner established a prima facie case is not in dispute.  Because the relevant aspects of the two cases are the same, and because this court is reviewing petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254, this court will refer to Batson in analyzing petitioner's claims.  See Mitleider v. Hall, 391 F.3d 1039, 1042 n.2 (9th Cir. 2004).

"'If the trial court makes a "sincere and reasoned effort" to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.  In such circumstances, an appellate court will not reassess good faith by conducting its own comparative juror analysis.  Such an approach would undermine the trial court's credibility determinations and would discount "'the variety of [subjective] factors and considerations,'" including "prospective jurors' body language or manner of answering questions," which legitimately inform a trial lawyer's decision to exercise peremptory challenges.'"  (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1197.)

*Jackson* held the trial court did not abuse its discretion in denying a *Wheeler* motion where the prosecutor used three of eighteen peremptory challenges to remove blacks from the jury, and no blacks served on the defendant's jury.  (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1195.)

"Jurors may be excused based on 'hunches' and even 'arbitrary' exclusion is permissible, so long as the reasons are not based on impermissible group bias.  [Citation.]  [¶]  There is a presumption that a prosecutor uses his or her peremptory challenges in a constitutional manner.  [Citation.]  We give great deference to the trial court in distinguishing bona fide reasons from sham excuses.  [Citation.]"  (*People v. Turner* (1994) 8 Cal.4th 137, 165.)

Citing *People v. Turner* (1986) 42 Cal.3d 711, [petitioner] asserts the standard of review is de novo.  However, *Turner* said the reviewing court will ordinarily defer to the trial court's factual findings, though "the issue whether a given explanation constitutes a constitutionally permissible–i.e., nondiscriminatory–justification for the particular peremptory challenge remains a question of law."  (*Id.* at p. 720, fn. 6.)

Here, even assuming a prima facie case was shown, [petitioner] on appeal fails to show grounds for reversal.  [Petitioner] does not challenge the prosecutor's justification for excusing the prospective juror whose brother was being prosecuted for sexual assault.  [Petitioner] instead focuses on the other prospective juror, Mr. Russell, who was excused because (1) he was reading in the jury box, (2) he was the victim of a drive-by shooting and appeared uncertain whether it was random, and (3) his body language betrayed discomfort with the question about unpleasant experiences with law enforcement.  We see no reason to disturb the trial court's denial of the *Wheeler* motion.

[Petitioner] suggests the prosecutor is a racist because he inappropriately drew an inference that when a black crime victim is shot at, the black victim must be involved in criminal activity.  [Petitioner's] argument misstates the record.  The prosecutor based his decision not merely on the fact of the shooting but on other

factors, including his observations that the prospective juror appeared uncertain whether it was a random shooting, and the observation–shared by the trial court–that the prospective juror reacted physically (though not verbally) when the jurors were asked about bad experiences with police.  Contrary to [petitioner's] suggestion, the prosecutor was not required to demand a verbal response from the prospective juror.  [Petitioner's] point that the body language may have signified something innocuous such as a stomachache does not undermine the prosecutor's decision or the trial court's ruling, under the foregoing legal standards allowing the use of peremptory challenges based on hunches.  [Petitioner] claims discrimination is shown by the very fact that the prosecutor and the trial court noticed the prospective juror's body language, which assertedly means they "singled [him] out."  This argument is nonsensical and offensive.

[Petitioner] argues the prosecutor's reasons for excusing Mr. Russell were pretextual because the prosecutor did not excuse other prospective jurors with similar characteristics.  Despite the California Supreme Court's holding that a reviewing court should not conduct its own comparative analysis (e.g., *People v. Jackson*, *supra*, 13 Cal.4th at p. 1197), [petitioner] cites federal circuit court of appeal cases for the proposition that an appellate court must perform a comparative analysis if a prosecutor's reasons for excusing prospective jurors appear pretextual because the prosecutor did not excuse non-black persons with similar characteristics.  (*Devose v. Norris* (8th Cir. 1995) 53 F.3d 201, 204-205; *Walton v. Caspari* (8th Cir. 1990) 916 F.2d 1352, 1362; *U.S. v. Chinchilla* (9th Cir. 1989) 874 F.2d 695, 698-699.) However, we rejected a similar reliance on federal cases in *People v. Dunn* (1995) 40 Cal.App.4th 1039, 1050.  We said, among other things, that we were bound by stare decisis to follow the California Supreme Court's directive.[8]  (*Id.* at p. 1050, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  We also observed the federal courts are split on the subject, and we were not persuaded by the analysis in those federal opinions which advocated a comparative analysis by the reviewing court.  (*People v. Dunn*, *supra*, 40 Cal.App.4th at pp. 1050-1051.)

[Petitioner] cites the concurring opinion in *Dunn*, which stated: "But if comparative data may not be used to show that the reasons offered for striking Black jurors are pretextual, such data also may not be used to show they were not pretextual, as the majority suggests.  What may be shown at this (third) stage of review is the 'persuasiveness of the justification.' [Citation.] . . . '[I]mplausible

---

[8]  We note the Jackson court was aware of the federal cases, as reflected by the separate concurring opinion of Jackson's author, Justice Mosk.  (*Jackson*, *supra*, 13 Cal.4th at p. 1249, conc. opn. of Mosk, J. [expressing view (contrary to majority view) that reviewing court should engage in comparative analysis, in line with cited federal cases].)

or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'" (*People v. Dunn*, *supra*, 40 Cal.App.4th at p. 1056, conc. opn. at Blease, J.)  Here, the prosecutor's justifications were not implausible or fantastic.

Although we conclude a comparative analysis by this court is not appropriate, we note [petitioner] would not prevail even under a comparative analysis.  Thus, the only similarity cited by [petitioner] is that other prospective jurors were reading.  However, [petitioner] fails to show other prospective jurors were reading *in the jury box*, which was the prosecutor's observation with respect to Mr. Russell.  [Petitioner] merely cites his attorney's comments during the *Wheeler* motion that other people were reading in the audience and one prospective juror "was reading the newspaper as he came up to sit into the jury box.  I noticed that, a folded newspaper."  [Petitioner] also cites his trial counsel's comment that other people on the jury "did not raise their hands to the trial court's questions they had answered in the jury questionnaire . . . ."  However, [petitioner] fails to show how this is similar to Mr. Russell's situation, where the issue was not necessarily his failure to respond verbally, but his body language.  Thus, [petitioner] fails to show any comparison.

We conclude the *Wheeler* motion was properly denied.

People v. Baker, slip op. at 17-23.

Petitioner argues that the state court's conclusion that the prosecutor's stated reasons for excluding Mr. Russell were race-neutral and not pretextual was unreasonable.[9]  As proof of this assertion, petitioner contends that the prosecutor's claim that the drive-by shooting raised an inference of criminal association was based on an impermissible racial stereotype. (Pet.'s Supp. Mem. at 16.)  Petitioner argues that the prosecutor inferred that because Mr. Russell was African-American and lived in a dangerous neighborhood, he could not have been an

---

[9]  In his amended petition, petitioner appears to challenge the prosecutor's dismissal of both prospective jurors, Mr. Russell and Ms. Bradley.  However, petitioner later concedes that the claim as to juror Bradley is not properly before the court based on respondent's argument that petitioner failed to exhaust his claim that juror Bradley was improperly excused in violation of Batson. (Answer, at 39-41; Resp't's Supp. Mem. at 15.)  Even assuming *arguendo* that petitioner is attempting to challenge the prosecutor's dismissal of Ms. Bradley, his challenge must fail.  The prosecutor's challenge to Ms. Bradley did not violate the federal constitutional standards set forth above in that the prosecutor stated valid, nondiscriminatory reasons, supported by the record, for excusing this juror.

1   innocent victim of a crime and must have had criminal associations.  (Id. 16-17, citing United

2   States v. Bishop, 959 F.2d 820 (9th Cir. 1992), overruled on other grounds as recognized by

3   Boyde v. Brown, 404 F.3d 1159, 1171 n.10 (9th Cir. 2005)(prosecutor's reason for exercising

4   peremptory challenge to exclude prospective black juror, that juror lived in predominantly low-

5   income, black neighborhood and was likely to believe that police "pick on black people" was not

6   adequate, race-neutral explanation for strike, as required by Batson).  Petitioner points out that it

7   did not appear the state court relied on this reason to deny petitioner's Batson claim.

8          Petitioner further argues that the prosecutor's reliance on Mr. Russell's body

9   language was pretextual.  Petitioner contends this reason should be scrutinized:  "This

10  explanation, without more, cannot be considered a reasoned explanation."  McClain v. Prunty,

11  217 F.3d 1209, 1223 (9th Cir. 2000).  Petitioner concedes that reliance on body language as a

12  basis for peremptory challenges is appropriate where the prosecutor offers a race-neutral

13  explanation of the significance of the body language.  Here, however, petitioner contends the

14  prosecutor speculated that Mr. Russell must have been hiding a prior bad experience with the

15  police, a reason which is not race-neutral because it builds on the racial stereotype that all

16  African-American men have historically had bad experiences with police.  Thus, any reliance on

17  this reason is unreasonable because it is not race-neutral.

18         Finally, petitioner contends that the state court's main reliance on the fact Mr.

19  Russell was reading in the jury box was unreasonable because Mr. Russell's inattention was

20  clearly a pretext, particularly when viewed together with the first two reasons and when

21  compared to the record.  Petitioner points out that it is undisputed that defense counsel stated that

22  a number of jurors were reading and the bailiff finally cautioned them.  Petitioner argues that Mr.

23  Russell could only have been reading for the brief period during which names were being read

24  and jurors were walking to the box; otherwise the court would have admonished him to stop.

25  There is no such admonishment in the record.  (ART 37-38.)  No other jurors were excused for

26  reading.  Petitioner argues that the state court's finding that Mr. Russell was not similarly

situated as the other reading jurors, based on his reading in the jury box, is not supported by the record.

Respondent contends that inattentiveness is considered a proper, race-neutral reason for excusing a juror.  Respondent argues that Mr. Russell's body language suggests a negative attitude toward law enforcement or lack of candor about his experiences, both of which would support a peremptory challenge by the prosecution.  Respondent argues that the state court's decision was not contrary to Batson.

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution.  See Batson v. Kentucky, 476 U.S. (1986).  So-called Batson claims are evaluated pursuant to a three-step test:

> First, the trial court must determine whether [petitioner] has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race.  Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. . . .  Third, the court must then determine whether [petitioner] has carried his burden of proving purposeful discrimination.

Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 973-74 (2006), citing Batson, 476 U.S. at 98.

This court is also required to use a deferential standard when reviewing a habeas petition's claims that were previously adjudicated by a state court on the merits.  28 U.S.C. § 2254(d).  Under those circumstances, a district court only grants a habeas petition where the decision of the state court was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

The record reflects that petitioner's trial counsel made an oral "Wheeler" motion immediately after the prosecutor exercised a peremptory challenge to excuse prospective jurors Mr. Russell (RAT 101) and Ms. Bradley (RAT 120).  In rejecting petitioner's claim that the trial court erred in denying his Wheeler motion, the California Court of Appeal assumed that the trial court found that petitioner had established a prima facie case of purposeful discrimination and

15

proceeded to rule on the ultimate question:  whether the prosecutor's use of a peremptory

challenge to excuse Mr. Russell was discriminatory.[10]  (Opinion at 11-13.)  With respect to that

issue, the appellate court concluded as follows:

> The Supreme Court recently reiterated the *Wheeler* principle in
> *People v. Jackson* (1996) 13 Cal.4th 1164, which stated:
>
> "'[P]eremptory challenges may not be used to remove
> prospective jurors solely on the basis of presumed group bias. . . .
> [T]he Equal Protection Clause forbids peremptory challenges of
> potential jurors solely on account of their race when [petitioner] is
> a member of that race. . . .  [¶] . . . [I]f a party believes his
> opponent is improperly using peremptory challenges for a
> discriminatory purpose, he must raise a timely challenge and make
> a prima facie case of such discrimination.  Once a prima facie case
> has been shown, the burden shifts to the other party to come
> forward with an explanation that demonstrates a neutral
> explanation related to the particular case to be tried. . . . [¶] . . .
> [W]e will "rely on the good judgment of the trial courts to
> distinguish bona fide reasons for such peremptories from sham
> excuses belatedly contrived to avoid admitting acts of group
> discrimination." . . .  The trial court, however, must make "a
> sincere and reasoned attempt to evaluate the prosecutor's
> explanation in light of the circumstances of the case as then
> known, his knowledge of trial techniques, and his observations of
> the manner in which the prosecutor has examined members of the
> venire and has exercised challenges for cause or peremptorily. . .
> .'"'" (*People v. Jackson*, *supra*, 13 Cal.4th at pp. 1195-1196.)
>
> "'If the trial court makes a "sincere and reasoned effort" to
> evaluate the nondiscriminatory justifications offered, its
> conclusions are entitled to deference on appeal.  In such
> circumstances, an appellate court will not reassess good faith by
> conducting its own comparative juror analysis.  Such an approach

---

[10]  In <u>People v. Wheeler</u>, 22 Cal. 3d 258 (1978), the California Supreme Court held that peremptory challenges may not be used to exclude from a jury all or most members of a cognizable group solely on the ground of presumed "group bias."  <u>Wheeler</u> is the "California analogue" to <u>Batson</u>.  <u>Lewis v. Lewis</u>, 321 F.3d 824, 827 & n.5 (9th Cir. 2003).  <u>Wheeler</u> differs from <u>Batson</u> in placing a more onerous burden of proof on the defendant in establishing a prima facie case of discrimination ("strong likelihood" vs "raise an inference").  <u>See Cooperwood v. Cambra</u>, 245 F.3d 1042, 1046-47 (9th Cir. 2001); <u>Wade v. Terhune</u>, 202 F.3d 1190, 1192 (9th Cir 2000) ("We hold that the Wheeler standard, as currently interpreted by the California courts, does not satisfy the constitutional requirement laid down in Batson.").  Here, however, the state trial court's finding that petitioner established a prima facie case is not in dispute.  Because the relevant aspects of the two cases are the same, and because this court is reviewing petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254, this court will refer to <u>Batson</u> in analyzing petitioner's claims.  <u>See Mitleider v. Hall</u>, 391 F.3d 1039, 1042 n.2 (9th Cir. 2004).

would undermine the trial court's credibility determinations and would discount "'the variety of [subjective] factors and considerations,'" including "prospective jurors' body language or manner of answering questions," which legitimately inform a trial lawyer's decision to exercise peremptory challenges.'" (*People v. Jackson, supra*, 13 Cal.4th at p. 1197.)

*Jackson* held the trial court did not abuse its discretion in denying a *Wheeler* motion where the prosecutor used three of eighteen peremptory challenges to remove blacks from the jury, and no blacks served on the defendant's jury. (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1195.)

"Jurors may be excused based on 'hunches' and even 'arbitrary' exclusion is permissible, so long as the reasons are not based on impermissible group bias. [Citation.] [¶] There is a presumption that a prosecutor uses his or her peremptory challenges in a constitutional manner. [Citation.] We give great deference to the trial court in distinguishing bona fide reasons from sham excuses. [Citation.]" (*People v. Turner* (1994) 8 Cal.4th 137, 165.)

Citing *People v. Turner* (1986) 42 Cal.3d 711, [petitioner] asserts the standard of review is de novo. However, *Turner* said the reviewing court will ordinarily defer to the trial court's factual findings, though "the issue whether a given explanation constitutes a constitutionally permissible–i.e., nondiscriminatory–justification for the particular peremptory challenge remains a question of law." (*Id.* at p. 720, fn. 6.)

Here, even assuming a prima facie case was shown, [petitioner] on appeal fails to show grounds for reversal. [Petitioner] does not challenge the prosecutor's justification for excusing the prospective juror whose brother was being prosecuted for sexual assault. [Petitioner] instead focuses on the other prospective juror, Mr. Russell, who was excused because (1) he was reading in the jury box, (2) he was the victim of a drive-by shooting and appeared uncertain whether it was random, and (3) his body language betrayed discomfort with the question about unpleasant experiences with law enforcement. We see no reason to disturb the trial court's denial of the *Wheeler* motion.

[Petitioner] suggests the prosecutor is a racist because he inappropriately drew an inference that when a black crime victim is shot at, the black victim must be involved in criminal activity. [Petitioner's] argument misstates the record. The prosecutor based his decision not merely on the fact of the shooting but on other factors, including his observations that the prospective juror appeared uncertain whether it was a random shooting, and the observation–shared by the trial court–that the prospective juror reacted physically (though not verbally) when the jurors were asked about bad experiences with police. Contrary to [petitioner's]

17

suggestion, the prosecutor was not required to demand a verbal response from the prospective juror. [Petitioner's] point that the body language may have signified something innocuous such as a stomachache does not undermine the prosecutor's decision or the trial court's ruling, under the foregoing legal standards allowing the use of peremptory challenges based on hunches. [Petitioner] claims discrimination is shown by the very fact that the prosecutor and the trial court noticed the prospective juror's body language, which assertedly means they "singled [him] out." This argument is nonsensical and offensive.

[Petitioner] argues the prosecutor's reasons for excusing Mr. Russell were pretextual because the prosecutor did not excuse other prospective jurors with similar characteristics. Despite the California Supreme Court's holding that a reviewing court should not conduct its own comparative analysis (e.g., *People v. Jackson*, *supra*, 13 Cal.4th at p. 1197), [petitioner] cites federal circuit court of appeal cases for the proposition that an appellate court must perform a comparative analysis if a prosecutor's reasons for excusing prospective jurors appear pretextual because the prosecutor did not excuse non-black persons with similar characteristics. (*Devose v. Norris* (8th Cir. 1995) 53 F.3d 201, 204-205; *Walton v. Caspari* (8th Cir. 1990) 916 F.2d 1352, 1362; *U.S. v. Chinchilla* (9th Cir. 1989) 874 F.2d 695, 698-699.) However, we rejected a similar reliance on federal cases in *People v. Dunn* (1995) 40 Cal.App.4th 1039, 1050. We said, among other things, that we were bound by stare decisis to follow the California Supreme Court's directive.[11] (*Id.* at p. 1050, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We also observed the federal courts are split on the subject, and we were not persuaded by the analysis in those federal opinions which advocated a comparative analysis by the reviewing court. (*People v. Dunn*, *supra*, 40 Cal.App.4th at pp. 1050-1051.)

[Petitioner] cites the concurring opinion in *Dunn*, which stated: "But if comparative data may not be used to show that the reasons offered for striking Black jurors are pretextual, such data also may not be used to show they were not pretextual, as the majority suggests. What may be shown at this (third) stage of review is the 'persuasiveness of the justification.' [Citation.] . . . '[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'" (*People v. Dunn*, *supra*, 40 Cal.App.4th at p. 1056, conc. opn. at Blease, J.) Here, the prosecutor's justifications were not implausible or fantastic.

---

[11] We note the *Jackson* court was aware of the federal cases, as reflected by the separate concurring opinion of *Jackson's* author, Justice Mosk. (*Jackson*, *supra*, 13 Cal.4th at p. 1249, conc. opn. of Mosk, J. [expressing view (contrary to majority view) that reviewing court should engage in comparative analysis, in line with cited federal cases].)

1    Although we conclude a comparative analysis by this court is not
appropriate, we note [petitioner] would not prevail even under a

2    comparative analysis.  Thus, the only similarity cited by
[petitioner] is that other prospective jurors were reading.  However,

3    [petitioner] fails to show other prospective jurors were reading *in
the jury box*, which was the prosecutor's observation with respect

4    to Mr. Russell.  [Petitioner] merely cites his attorney's comments
during the *Wheeler* motion that other people were reading in the

5    audience and one prospective juror "was reading the newspaper as
he came up to sit into the jury box.  I noticed that, a folded

6    newspaper."  [Petitioner] also cites his trial counsel's comment that
other people on the jury "did not raise their hands to the trial

7    court's questions they had answered in the jury questionnaire . . . ."
However, [petitioner] fails to show how this is similar to Mr.

8    Russell's situation, where the issue was not necessarily his failure
to respond verbally, but his body language.  Thus, [petitioner] fails

9    to show any comparison.

10    We conclude the *Wheeler* motion was properly denied.

11  (Id. at 11-13.)

12    As noted above, the state court of appeal found that the prosecutor's stated

13  reasons for exercising peremptory challenges were race-neutral.  The prosecution stated it

14  exercised its peremptory challenge as to Vernita Bradley because her brother had been convicted

15  of a sexual assault.  (RT 41.)  That reason was reflected in Bradley's voir dire response.  (ART

16  103.)

17    The prosecutor cited three reasons he exercised his peremptory challenge as to

18  prospective juror Stephen Russell.  First, Mr. Russell was reading his book while the rest of the

19  jurors were being called into the juror box.  (RT 41.)  Second, Mr. Russell had been the victim of

20  a drive-by shooting.  (RT 42.)  Third, Mr. Russell had exhibited certain body language, body-

21  shifting, moving of the eyes, and heavy sighs, while other jurors were being questioned about

22  experiences with law enforcement.  (RT 43.)  These reasons are sufficient to meet the second

23  prong of Batson.  The court must now determine whether petitioner has carried his burden of

24  proving purposeful discrimination.

25  /////

26  /////

19

1        The prosecutor supported his first reason as follows:  Mr. Russell

2        was one of the first people in the box.  He brought up a book and
was reading it while the rest of the jurors were being called up.

3        That is rather, to my mind, inappropriate behavior in a court of
law, and inappropriate behavior at least to me, raises concerns

4        about whether or not this is an appropriate person to sit in a
criminal case, whether or not he is dealing with it seriously enough

5        in a criminal case.

6  (RT 41-42.)

7        Second, during voir dire, Mr. Russell "revealed that he was the victim of a drive-

8  by shooting in 1990 in Southern California, and he stated – the term he used was that he thought

9  or thinks, that it was random."  (RT 42.)  The prosecutor continued:

10        Obviously I am not in a position where I can run raps on these
jurors.  I have no idea what all that means.

11

12        I will freely concede that there are a number of times when
people's houses are shot up for completely random purposes, but I
don't know for sure, and it doesn't sound like from his answer, that

13        he even knew for sure either.

14        Now, if somebody is shooting up his house, then the next question
is why?  Why is he being singled out for that sort of thing?

15        That raises concerns in my mind that he has got some ties with
some people who may have had criminal backgrounds in Southern

16        California where that incident occurred.

17        Again, I am not in a position where I can start checking these
things out.  All I can go on is the clues that are left with me during

18        the course of voir dire examination; and, frankly, that clue left me
with very real concerns.

19

20  (RT 41-42.)

21        Third, Mr. Russell shifted in his chair, moved his eyes and sighed heavily several

22  times while the court was questioning different jurors about unpleasant experiences with law

23  enforcement officers.  (RT 43.)  The trial court remarked that it had expected Mr. Russell to

24  respond.  (RT 43.)  The prosecutor concluded:

25        Again, I have no way of knowing more about this man's
background than what we were getting during the course of the

26        voir dire examination, but ultimately with those three things in my

mind, I did not feel I could take the chance of leaving him on this panel.

As the Court is aware, I need 12 votes.  This is a matter obviously of some importance to me.  If I don't get 12 votes, I have to put all these women through this again.  I could not in all fairness take the chance.

I would further state for the record, I understand defense counsel's point in making a *Wheeler* motion.  If I were in her position, I would make the same exact motion.

Typically speaking, though, I probably give more leeway in terms of my exercise of peremptory challenges to persons of minorities than I do to other persons, not because I am a virtuous person on the question of race, but because I do not want to make it look like, to the other jurors, that I am a bigot.

I have no concerns, frankly, whenever I exercise a challenge in this regard, that I am doing it for racial reasons; but obviously the jurors don't know what is going on in my mind.

I may be able to satisfy the Court that I am not using it for racial reasons, but the other jurors don't know that.

So to be perfectly blunt, I think that I exercise extraordinary care, typically speaking, when I exercise challenges for persons who are minorities, and I did that in this case because, frankly he does make me nervous.  I did not think in light of what I was basically seeing, as opposed to the way I was hearing, for the most part from Mr. Russell, that I could even trust my client's case to his care.

(RT 43-44.)

Petitioner's defense counsel objected:

The fact that Mr. Russell was reading, other people were reading.  Mr. Meyers was reading the newspaper as he came up to sit into the jury box.  I noted that, a folded newspaper.

And the Bailiff just had to make an announcement because people in the audience were reading.  That's what jurors do.

And I certainly didn't notice Mr. Russell reading once the Court started to talk or do anything of significance.

The drive-by shooting thing is amazing to me that Mr. Kindall would bring that up.  He may hang around with people who have criminal connections.

/////

1
2

> This man is married, has three children, is a state worker, and apparently does not have any criminal convictions because that was asked.

3
4

> And so the fact that someone may at some point have their paths cross somebody who is involved in crime, I certainly don't think is a reason to exclude without further examination.

5
6
7
8

> If we are all shocked that Mr. Russell did not raise his hand when asked about bad experiences with police officer, it's because we know that most Black men out there have had some bad experiences with police officers, and perhaps that's why Mr. Russell smiled and shifted in his chair because, you know, he thinks it's a pretty obvious thing, but apparently none of them were bad enough for him to raise his hand about.

9
10
11

> There are several people on this jury, and maybe the Court is not aware, but Mr. Kindall is, because I am sure he read the jury questionnaires, who did not raise their hand to things that the Court asked that were right there on the jury questionnaire.

11
12

> So sometimes people make a judgment that, you know,  it's just not important enough to bring up at this time.

13   (RT 44-46.)  The trial court was "not satisfied that sufficient grounds have been established that

14   the challenges heretofore exercised by the People were violative of *Wheeler*, and the motion to

15   excuse the panel is denied."  (RT 46.)

16          i.  <u>Prima Facie Case</u>

17          Petitioner must show that "he is a member of a cognizable racial group," <u>Batson</u>,

18   476 U.S. at 96, and that the circumstances and facts raise an inference that the prosecution has

19   excluded potential jurors based on their race.  Here, both petitioner and Mr. Russell are African-

20   American, members of a cognizable racial group.  There were only two African-Americans on

21   the 60 person jury venire.  (RT 39.)  Mr. Russell was the first African-American on the jury panel

22   when the prosecutor exercised the peremptory challenge; Ms. Bradley, also African-American,

23   took the box later and was subsequently excused by peremptory challenge.  The fact that all

24   blacks in the venire pool were struck raises an inference of discrimination.  <u>McClain</u>, 217 F.3d at

25   1224.

26   /////

1            ii.  Race-Neutral Reasons

2            Next, the burden shifts to the prosecution to articulate a race-neutral explanation

3   for the exercise of the peremptory challenge to Mr. Russell.  See Batson, 476 U.S. at 97.  "A

4   neutral explanation in the context of our analysis here means an explanation based on something

5   other than the race of the juror."  Hernandez v. New York, 500 U.S. 352, 360 (1991) (plurality

6   opinion)).  "At this step of the inquiry, the issue is the facial validity of the prosecutor's

7   explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason

8   offered will be deemed race-neutral."  Stubbs v. Gomez, 189 F.3d 1099, 1105 (1999) (quoting

9   Hernandez, 500 U.S. at 360.)

10           As noted above, the prosecution gave three separate reasons why he exercised his

11  peremptory challenge as to Mr. Russell:  Mr. Russell had been the victim of a drive-by shooting,

12  he had exhibited body language during questioning about experiences with law enforcement, and

13  was reading in the jury box.  These reasons, on their face, are race-neutral and thus meet the

14  second step of Batson analysis.

15           iii.  Evidence of Purposeful Discrimination

16           It is at the third step of the three-step inquiry that the court reaches the "real meat"

17  of a Batson challenge.  Lewis, 321 F.3d at 830.  It is at this step that "the trial court must

18  determine whether the defendant has carried his burden of proving purposeful discrimination."

19  McClain, 217 F.3d at 1220 (quoting Hernandez, 500 U.S. at 359).  See also Batson, 476 U.S. at

20  98.  Thus, the trial court must evaluate the prosecutor's proffered reasons and make a credibility

21  determination.  Lewis, 321 F.3d at 830; McClain, 217 F.3d at 1220.  As with any credibility

22  determination, the trial court's own observations are of significant importance.  Batson, 476 U.S.

23  at 98, n.21; Lewis, 321 F.3d at 830.  It has also been observed that:

24           Other factors come into play in a court's evaluation of a
             prosecutor's reasons as well, however. For example, if a review of
25           the record undermines the prosecutor's stated reasons, or many of
             the proffered reasons, the reasons may be deemed a pretext for
26           racial discrimination. Similarly, a comparative analysis of the

23

1   struck juror with empaneled jurors "is a well-established tool for
2   exploring the possibility that facially race-neutral reasons are a
    pretext for discrimination." [citation omitted.]  After analyzing
3   each of the prosecutor's proffered reasons, our precedent suggests
    that the court should then step back and evaluate all of the reasons
4   together. The proffer of various faulty reasons and only one or two
    otherwise adequate reasons, may undermine the prosecutor's
5   credibility to such an extent that a court should sustain a *Batson*
    challenge. [citation omitted.]

6   Lewis, 321 F.3d at 830-31.  See also McClain, 217 F.3d at 1221 ("Peremptory challenges cannot

7   be lawfully exercised against potential jurors of one race unless potential jurors of another race

8   with comparable characteristics are also challenged.") (quoting Turner v. Marshall, 121 F.3d

9   1248, 1251 (9th Cir.1997).  See also Miller-El v. Dretke, 545 U.S. 231 (2005) (utilizing

10  comparative analysis, in a case in which a prima facie showing had been made, to determine

11  whether the prosecutor had been motived by racial bias in exercising peremptory challenges).[12]

12        On the other hand, the fact that a prosecutor's reasons may be "founded on

13  nothing more than a trial lawyer's instincts about a prospective juror" does not "diminish the

14  scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons

15  for the prosecutor's actions."  Power, 881 F.2d at 740 (quoting United States v. Chinchilla, 874

16  F.2d 695, 699 (9th Cir. 1989)).  "Excluding jurors because of their profession, or because they

17  acquitted in a prior case, or because of a poor attitude in answer to voir dire questions is wholly

18  within the prosecutor's prerogative."  United States v. Thompson, 827 F.2d 1254, 1260 (9th Cir.

19  1987).  Rather, "[e]vidence in the record of objective reasons to strike a juror implies that racial

20  bias did not motivate the prosecutor."  Boyd v. Newland, 393 F.3d 1008, 1013 (9th Cir. 2004).

21  See also Paulino v. Castro, 371 F.3d 1083, 1091-92 (9th Cir. 2004) ("While we may consider

22  whether the record contains entirely plausible reasons, independent of race, why a prosecutor

---

23        [12]  Comparative juror analysis refers to "an examination of a prosecutor's questions to
24  prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise
    similar jurors differently because of their membership in a particular group."  *Boyd*, 2006 WL
25  3026021 at *5.  *See also Miller-El*, 125 S.Ct. at 2325 (stating that "side-by-side comparisons of
    some black venire panelists who were struck and white panelists allowed to serve" was "more
26  powerful" than bare statistics).

1 may have exercised peremptories, such reasons have usually helped persuade us that defendant

2 made no prima facie showing where defendant challenged the excusal of just one juror.")

3          Petitioner bears the burden of persuasion to prove the existence of unlawful

4 discrimination. Batson, 476 U.S. at 93. "This burden of persuasion 'rests with, and never shifts

5 from, the opponent of the strike.'" Id. at 2417 (quoting Purkett v. Elem, 514 U.S. 765, 768

6 (1995) (per curiam). However, petitioner "is entitled to rely on the fact, as to which there can be

7 no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to

8 discriminate who are of a mind to discriminate.'" Batson, 476 U.S. at 96 (quoting Avery v.

9 Georgia, 345 U.S. 559, 562 (1953).

10          "Under AEDPA, however, a federal habeas court must find the state-court

11 conclusion 'an unreasonable determination of the facts in light of the evidence presented in the

12 State court proceeding." Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 974 (2006) quoting 28

13 U.S.C. § 2254(d)(2). "[A] federal habeas court can only grant [habeas relief] if it was

14 unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge." Rice,

15 126 S.Ct. at 974. In determining whether a state court's application of law or factual

16 determination is "unreasonable," the court cannot simply consider whether it would have reached

17 a different outcome on the same record. Rice, 126 S.Ct. 974 (2006) (stating that "[r]easonable

18 minds reviewing the record might disagree about" the ultimate issue is insufficient for habeas

19 relief). "The 'unreasonable application' clause requires the state court decision to be more than

20 incorrect or erroneous." Lockyer v. Andrade, 538 U.S. 63, 75 (2003). Only if the evidence is

21 "too powerful to conclude anything but" the contrary should the district court grant relief.

22 Miller-El v. Dretke, 545 U.S. 231, 265 (2005).

23          After reviewing the record, including the voir dire transcript for comparative

24 analysis, the undersigned finds that the state court's disposition of this claim was not contrary to

25 or an unreasonable application of clearly established federal law nor did it result in a decision

26 that was based on an unreasonable determination of the facts in light of the evidence presented in

the state court proceeding.  The conclusion of the state appellate court that it should defer to the

trial judge's credibility determination is supported by the record and recent Supreme Court

authority.  Rice, 126 S.Ct. 974.  So too is the state appellate court's determination that the

prosecutor did not exercise a peremptory challenge to Mr. Russell based on membership in a

particular group.  The prosecutor expressed neutral, reasonable bases for the use of the

peremptory challenge of Mr. Russell.  See Power, 881 F.2d at 740.  His reasons were "clear and

reasonably specific" and were "related to the particular case to be tried."  Purkett, 514 U.S. at

768-69.  See also Mitleider v. Hall, 391 F.3d 1039, 1049 (9th Cir. 2004) ("We have reviewed the

record and Mitleider's presentation and conclude that he has not demonstrated that it was

unreasonable for the trial judge to find the prosecutor credible.")[13]

Here, the prosecution admitted that the circumstances surrounding the drive-by

shooting were unknown and conceded he had no way to find out about those details.  Petitioner

attempts to take the prosecution's reference to criminal activity a step further, suggesting that the

prosecution was inferring that Mr. Russell lived in a dangerous neighborhood and because he is

African-American he could not be an innocent victim of a crime and must have had criminal

associations.  That is one plausible inference.  However, it is also plausible that because Mr.

Russell did not know and the prosecution could not find out the genesis of the drive-by shooting,

his best option was to excuse Mr. Russell as a crime victim.  The prosecution's passing reference

to criminal associations does not require an inference that Mr. Russell was not an innocent victim

or that the comment was based on race.  Mr. Russell could have Caucasian friends or

acquaintances involved in criminal activity.  The drive-by shooter in Southern California could

have been Caucasian, Asian, Hispanic or African-American.  The reference to Southern

California was not specific enough to pinpoint a particular race.  Cf. United States v. Bishop, 959

F.2d 820 (9th Cir. 1992)(implicitly equating low-income, black neighborhoods (people from

[13]  The only two African-American potential jurors were questioned and excused by the prosecution via peremptory challenges.

1  Compton) with violence injected bias), *overruled on other grounds as recognized by* <u>Boyde v.</u>

2  <u>Brown</u>, 404 F.3d 1159, 1171 n.10 (9th Cir. 2005).

3      Petitioner contends the prosecutor passed peremptory challenges to other crime

4  victims.  Potential juror Harper had been assaulted 15 years earlier.  (RAT 42.)  However, the

5  defense excused Ms. Harper by peremptory challenge before the prosecution exhausted its

6  peremptory challenges.  (RAT 101.)  Potential juror Wareham had been molested at the age of 5,

7  blocked the memory for several years, then ten years later sought counseling.  (RAT 43.)  Ms.

8  Wareham was also excused by the defense prior to the exhaustion of the prosecution's

9  peremptory challenges.  (RAT 120.)

10     The assault on Harper and the molest of Wareham were remote in time compared

11  to the drive-by shooting which took place only 5 years prior to the instant trial.  (RAT 44.)

12     This court also rejects petitioner's argument that the prosecutor's retention of

13  other reading jurors demonstrates that the prosecutor was acting with discriminatory motive.  The

14  location of the reading is distinguishable; once seated in the jury box, attention to the

15  proceedings is critical.  Thus, those reading in the audience, or immediately prior to being seated

16  in the box, did not share "comparable characteristics" with prospective juror Mr. Russell against

17  whom the prosecutor exercised a peremptory challenge.  Moreover, unlike the trial judge in <u>Rice</u>,

18  who did not witness the potential juror's eye rolling, the trial judge in the instant case witnessed

19  Mr. Russell's body language and acknowledged it during the <u>Wheeler</u> hearing.  This court must

20  defer to the trial judge's view of that behavior.

21     Finally, the record supports the state court's view that the prosecution based his

22  decision to excuse Mr. Russell on all three reasons.  It appears the inattentiveness and body

23  language exhibited during the questions concerning law enforcement may have strengthened the

24  prosecution's concern about Mr. Russell's ability to serve as a juror.

25     This court may have reached a different conclusion had it served as the trial court

26  or reviewed the case on direct appeal.  But on habeas review, this court cannot find that the state

1   court was unreasonable to credit the prosecutor's race-neutral explanations for the <u>Batson</u>

2   challenge.  Petitioner's <u>Batson</u> claim should be denied.

3                      B.  <u>Confrontation Clause Claim (Claim 1)</u>

4           In his amended petition, petitioner claims his rights under the Fifth, Sixth, and

5   Fourteenth Amendments were violated by (a) the trial court's decision to permit testimony from

6   witnesses who were not victims in the instant action and (b) by denying petitioner evidence that

7   might have led a reasonable jury to find in his favor because the trial court relied on rape shield

8   laws to limit petitioner's cross-examination of these witnesses.  (<u>Id.</u>)  Specifically, petitioner

9   contends he was deprived of his right to confront Amber H. when the trial court barred him from

10  cross-examining her about evidence that she intended to have consensual sex with petitioner

11  when she put out her "trophy" blanket.[14]  (December 20, 2004 Supp. Mem. at 23.)

12          Respondent contends this claim fails under <u>Wood v. Alaska</u>, 957 F.2d 1544 (9th

13  Cir. 1992) because the court "approved exclusion of the victim's showing her Penthouse photos

14  to the defendant because, although relevant as past sexual conduct with the defendant, it was

15  more prejudicial than probative to other evidence that they had a sexual relationship."  (Answer,

16  at 22.)  Because the court admitted other evidence of sexual conduct by Amber with other men,

17  respondent argues the blanket was properly excluded as cumulative.  (Answer, at 23.)

18          The last reasoned rejection of this claim is the decision of the California Court of

19  Appeal for the Third Appellate District on petitioner's direct appeal.  On direct appeal, petitioner

20  argued that the rape shield law was only meant to protect the victim of the instant offense

21  (Theresa A.) and thus did not protect a witness called pursuant to Cal. Evidence Code § 1108.

22  The Third District Court of Appeal rejected that argument, concluding that any error was

23  harmless.  <u>People v. Baker</u>, slip op. at 39-40.  The state court noted that the "trial court concluded

24

25          [14]  Although the blanket was not available for inspection, defense counsel explained that
    the blanket at issue was taken into custody and found to be "full of semen stains which were
    analyzed to be semen stains and which had little hearts with initials around each one "indicating I
26  guess the different donors."  (RT 168.)

the evidence went purely to past sexual conduct, implicitly finding that the blanket was not

probative on the issue of consent." Id. at 40. The state court agreed with the trial court, further

stating:

> In order for the blanket to be probative of Amber's consent to have
> sex with [petitioner], there would have to be evidence of some
> circumstance tending to show that Amber took the blanket out on
> the occasion of [petitioner's] visit in order figuratively to add
> another notch to her bedpost. However, there was no evidence or
> offer of proof in that regard. Defense counsel merely speculated:
> "If, if this blanket is something that she uses for sex all the time, it
> would suggest that, you know, it didn't just happen the way she
> said, that she laid the blanket out there in her apartment." There
> was no evidence or offer of proof that would tend to show Amber's
> state of mind in having the blanket there at that time and place. As
> noted by the trial court, Amber had very few items in the
> apartment. The evidence showed she was in the process of moving
> out of her apartment at the time of the encounter with [petitioner].
> Her testimony and the photographic exhibits show she had only a
> few items–television, blanket, suitcases, etc.–in the apartment.
> Given the disarray of a move-in-progress, the presence and use of
> the blanket say nothing about Amber's state of mind, on this
> record.
>
> We thus conclude the blanket was not probative on the question of
> Amber's consent to have sex with [petitioner].

People v. Baker, slip op. at 40.

The state court went on to find that the relevance of Amber's past sexual conduct

was slight at best and stated that even assuming her past sexual conduct was admissible, the

blanket was unnecessary because

> Amber admitted in this trial that she had sex with other men,
> including the fact that at the time of the incident with [petitioner],
> she was pregnant by another man whom she did not consider to be
> her boyfriend. She also testified she once exposed her breasts to a
> group of people at a party. Thus, the blanket would be merely
> cumulative on the question of Amber's past sexual conduct.

Id. at 41. The state court also rejected petitioner's arguments that the blanket was necessary to

impeach Amber's characterization of petitioner as "brutal," finding petitioner had "failed to

explain how testimony about the blanket would have impeached Amber." Id.

The state court also rejected petitioner's Confrontation Clause argument, properly employing the standard required by the United States Supreme Court in Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  The state court concluded that excluding the cross-examination about the blanket did not violate petitioner's rights under the Confrontation Clause based on the state court's earlier discussion concerning this witness.  Finally, the state court further found:

> Even assuming for the sake of argument [petitioner] should have been able to pursue cross-examination on the question of the blanket, any error is harmless beyond a reasonable doubt on this record.  (*Chapman v. California* (1967) 386 U.S. 18, 24 . . . .)

People v. Baker, slip op. at 44.

"[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."  Estelle v. McGuire, 502 U.S. at 67.  Because federal habeas relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  Drayden, 232 F.3d at 710; Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999), cert. denied, 531 U.S. 995 (2000); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  In a federal habeas proceeding, the court must assess whether the improper exclusion of evidence violated due process by examining "the probative value of the evidence on the central issue; its reliability; whether it is capable of evaluation by the trier of fact; whether it is the sole evidence on the issue or merely cumulative; and whether it constitutes a major part of the attempted defense."  Drayden, 232 F.3d at 711 (quoting Miller v. Stagner, 757 F.2d 988, 994 (9th Cir.), amended on denial of reh'g, 768 F.2d 1090 (9th Cir.1985)).  A defendant's right to present evidence is not absolute; he must comply with established rules of evidence and procedure.  Carriger v. Lewis, 971 F 2d 329, 333 (9th Cir. 1992).  A criminal defendant "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  Montana v. Egeloff, 518 U.S. 37, 42 (1996) (quoting Taylor v. Illinois, 484 U.S. 400, 410 (1988)).

1    Criminal defendants have a constitutional right, implicit in the Sixth Amendment,

2 to present a defense; this right is "a fundamental element of due process of law." Washington v.

3 Texas, 388 U.S. 14, 19 (1967).  See also Crane v. Kentucky, 476 U.S. 683, 687, 690 (1986);

4 California v. Trombetta, 467 U.S. 479, 485 (1984); Webb v. Texas, 409 U.S. 95, 98 (1972).

5 However, the constitutional right to present a defense is not absolute.  Alcala v. Woodford, 334

6 F.3d 862, 877 (9th Cir. 2003).  "Even relevant and reliable evidence can be excluded when the

7 state interest is strong."  Perry v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983).  Thus,

8         [w]here evidence has been excluded pursuant to a state evidentiary
          law, we use a balancing test:  In weighing the importance of
9         evidence offered by a defendant against the state's interest in
          exclusion, the court should consider the probative value of the
10        evidence on the central issue; its reliability; whether it is capable of
          evaluation by the trier of fact; whether it is the sole evidence on the
11        issue or merely cumulative; and whether it constitutes a major part
          of the attempted defense. A court must also consider the purpose of
12        the [evidentiary] rule; its importance; how well the rule
          implements its purpose; and how well the purpose applies to the
13        case at hand. The court must give due weight to the substantial
          state interest in preserving orderly trials, in judicial efficiency, and
14        in excluding unreliable or prejudicial evidence.

15 Alcala, 334 F.3d at 877 (quoting Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985)).  See also

16 Drayden, 232 F. 3d at 711.  A state law justification for exclusion of evidence does not abridge a

17 criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and

18 "infringe[s] upon a weighty interest of the accused." United States v. Scheffer, 523 U.S. 303,

19 308 (1998).  See also Crane, 476 U.S. at 689-91 (discussion of the tension between the discretion

20 of state courts to exclude evidence at trial and the federal constitutional right to "present a

21 complete defense"); Greene v. Lambert, 288 F.3d 1081, 1090 (9th Cir. 2002).

22    The right to confront witnesses, guaranteed by the Sixth and Fourteenth

23 Amendments, includes the right to cross-examine adverse witnesses to attack their general

24 credibility or show their possible bias or self-interest in testifying.  Olden v. Kentucky, 488 U.S.

25 227, 231 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986); Davis v. Alaska, 415

26 U.S. 308, 316 (1973).  A Confrontation Clause violation occurs where the defendant is prevented

31

1   from investigating "a prototypical form of bias" if "[a] reasonable jury might have received a

2   significantly different impression of [the witness'] credibility had respondent's counsel been

3   permitted to pursue his proposed line of cross-examination").  Van Arsdall, 475 U.S. at 680.

4   However, "[t]rial judges retain wide latitude insofar as the Confrontation Clause is concerned"

5   and may impose limitations on cross-examination that are "reasonable' and are not "arbitrary or

6   disproportionate to the purposes they are designed to serve."  Id. at 679; Michigan v. Lucas, 500

7   U.S. 145, 151 (1991).  "The Confrontation Clause guarantees an *opportunity* for effective

8   cross-examination, not cross-examination that is effective in whatever way, and to whatever

9   extent, the defense might wish."  Van Arsdall, 475 U.S. at 679 (quoting Delaware v. Fensterer,

10   474 U.S. 15, 20 (1985) (per curiam)).  A defendant does not have a right to present irrelevant

11   evidence.  Wood v. State of Alaska, 957 F.2d 1544, 1549 (9th Cir. 1992).  The determination of

12   whether evidence is relevant rests in the discretion of the trial court.  Id.

13         A two-part inquiry is appropriately used to determine whether a criminal

14   defendant's Sixth Amendment rights were violated by the exclusion of evidence.  Wood, at 1549-

15   50.  First, the court looks at whether the evidence was relevant.  Id. at 1550.  If the evidence is

16   relevant, the court looks at whether "legitimate interests outweighed [the defendant's] interest in

17   presenting the evidence."  Id.  A Sixth Amendment violation will only be found if the trial court

18   abused its discretion in making its evidentiary ruling.  Id.  A trial court does not abuse its

19   discretion so long as the jury has "sufficient information" upon which to assess the credibility of

20   witnesses. [Citations omitted.]  Wood, 957 F.2d at 1550.

21         The improper denial of a defendant's opportunity to impeach a witness for bias is

22   subject to a harmless-error analysis.  Van Arsdall, 475 U.S. at 684; Bockting v. Bayer, 399 F.3d

23   1010, 1020 (9th Cir. 2005) ("Confrontation Clause violations are subject to harmless error

24   analysis and thus may be excused depending on the state of the evidence at trial").  Thus,

25   petitioner is not entitled to relief unless he can establish that the trial court's error "had

26   substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

1   Abrahamson, 507 U.S. 619, 637 (1993).  See also Forn v. Hornung, 343 F.3d 990, 999 (9th Cir.

2   2003) (finding that a Confrontation Clause error did not have a "substantial and injurious" effect

3   on the verdict and that the error was therefore harmless).

4           In the instant case, the trial court specifically found the blanket was not probative

5   on the issue of consent.  (RT 172.)  The trial court granted defense counsel an opportunity to

6   make an offer of proof that the blanket testimony should come in.  (RT 168.)  The trial court

7   ultimately cut off petitioner's counsel's efforts to pursue this line of questioning based on a

8   finding that it fell within the "ambit of the rape shield law."  (RT 172.)  The trial court

9   specifically stated the evidence surrounding the blanket went "purely to past sexual conduct."

10   (Id.)  Ironically, the trial court allowed other evidence of prior sexual conduct by Amber with

11   other men despite its application of the rape shield law to exclude the blanket testimony.

12           First, the court notes that defense counsel was not very effective at explaining

13   how testimony concerning the blanket would demonstrate Amber's consent to have sex with

14   petitioner.  The trial court excused the jury and gave petitioner a chance to make an offer of proof

15   to support admission of this testimony concerning the blanket.  (RT 168.)  Defense counsel could

16   have placed defendant on the stand (he testified at trial) and have him testify as to whether the

17   blanket was out when he arrived or whether Amber brought the blanket out, whether Amber took

18   any actions with the blanket while he was present, whether Amber explained the significance of

19   the blanket, etc.  But, as the state appellate court accurately noted, "Defense counsel merely

20   speculated:  'If, if this blanket is something that she uses for sex all the time, it would suggest

21   that, you know, it didn't just happen the way she said, that she laid the blanket out there in her

22   apartment.'"  People v. Baker, slip. op. at 40.  Even if the blanket was something Amber used for

23   sex all the time, the blanket's presence, without more, still would not demonstrate that Amber

24   consented to have sex with petitioner on the night in question.

25           In addition, the state court found that exclusion of this evidence was proper

26   because it was cumulative of the other evidence of Amber's past sexual conduct with others,

1  referring to Amber's testimony that she was pregnant by another man whom she did not consider

2  to be her boyfriend and that she had at one time exposed her breasts to people at a party.

3  Petitioner's habeas counsel makes a convincing argument that the testimony concerning the

4  blanket was more probative than this other evidence because petitioner intended to use it to

5  suggest Amber consented to have sex with petitioner, not with other men.  However, this court

6  may not substitute its opinion concerning the evidence for that of the trial court.  It was not

7  unreasonable for the state court to find that this evidence was cumulative, particularly where

8  evidence of a victim's past sexual conduct with others is irrelevant and inadmissible.  <u>Wood</u>, 957

9  F.2d 1550-54.

10        Defense counsel was not allowed to ask Amber whether Amber had, in fact,

11  brought out the blanket while petitioner was present or even with the intention of engaging in sex

12  with petitioner.  But the exchange between defense counsel and the trial court demonstrates that

13  the issue of force diminished the probative value of the blanket testimony on the issue of consent.

14  (RT 168-72.)  Even if Amber brought out the blanket with the express intention of having sex

15  with petitioner, the fact that she "made for the door" (RT 176) once petitioner removed her top,

16  raises an inference that she had changed her mind by that point and did not consent to his

17  advances.  (RT 176.)  Amber further testified that she thought "making for the door [was] pretty

18  much telling him I don't want to do this."  (RT 176.)  Because Amber claimed petitioner forced

19  her to perform these sex acts, the significance of the blanket is diminished as the blanket

20  appeared to be marking consensual sex acts, not forcible ones.  Thus, the testimony concerning

21  the blanket was only marginally relevant at best.

22        After reviewing the record, this court finds that petitioner's right to confrontation

23  was not violated by the trial court's exclusion of testimony concerning the blanket.  Petitioner

24  was allowed to cross-examine Amber.  (RT 153-83.)  Defense counsel elicited the following

25  testimony from Amber on cross examination:

26  /////

1    Petitioner referenced having sex with Amber at least two times earlier on the date

2    in question. (RT155, 161.)  Amber confirmed she was wearing an "itty bitty tank top" or "half

3    shirt" that "barely hit the waistband" of the shorts she was wearing.  (RT 158.)  She confirmed

4    she wore no bra under her top and no panties under her shorts.  (Id.)  Amber conceded she had

5    been kissing petitioner earlier in the evening.  (RT 162.)

6    Amber had previously pulled up her shirt and showed her breasts to everybody at

7    a party. (RT 160.)  Amber denied she had a boyfriend yet at the time of the alleged rape Amber

8    was pregnant by another man whom she did not consider to be her boyfriend.  (RT 176.)  ("We

9    never really went out and did anything.  We come to my house, have drinks and basically, you

10   know, sit around, watch TV and have sex, but we were not boyfriend and girlfriend per se.")

11   Amber stated that she and petitioner returned to her apartment late at night, and

12   that when he asked if  he could come up, she said "sure."  (RT 166.)  She confirmed that she and

13   petitioner had sat on a blanket and watched television for several hours.  (RT 166.)  Amber

14   denied telling petitioner no, agreed she did not push petitioner away and denied asking him to

15   leave.  (RT 176.)  The alleged rape lasted for hours (RT 178); Amber left the apartment with

16   petitioner at 8:00 the following morning (RT 180), she carried petitioner's hair gel for him (RT

17   181), and she walked petitioner to his car (RT 181).  Amber confirmed that petitioner returned

18   within two minutes because his car wouldn't start, and she went back down to help him get it

19   started, then walked part way home with him.  (RT 182.)  Amber said petitioner "stated he would

20   see me after work, and I agreed."  (RT 182.)

21   Defense counsel also pointed out the discrepancies between her trial testimony

22   and her testimony at the preliminary hearing.  (RT 173-74; 175.)

23   Thus, while petitioner argues that the prosecution had dressed Amber up as a

24   sober and respectable mother with children and the testimony concerning the blanket was

25   required to impeach her present persona, this court finds that defense counsel effectively painted

26   /////

a very different picture of this witness on cross-examination.  Excluding the testimony

concerning the blanket did not keep petitioner from effectively impeaching Amber's testimony.

Further, the fact that Amber kept a trophy blanket did not tend to establish that

Amber was lying; at best, it was evidence that Amber engaged in consensual sex with other men,

which she was entitled to do.  Just because Amber engaged in sex with other men does not prove

she engaged in consensual sex with petitioner on the night in question.  Therefore, the evidence

would not have made a significant difference in the jury's assessment of Amber's credibility.

See Van Arsdall, 475 U.S. at 680.

Based on the foregoing, this court cannot find that the trial court abused its

discretion in making its evidentiary ruling.  Id.  There was sufficient information before the jury

to assess the credibility of Amber as a witness.

Moreover, the failure to allow introduction of the testimony concerning the

blanket did not have a substantial and injurious effect or influence in determining the jury's

verdict.  Even assuming, *arguendo*, that petitioner could have impeached Amber's testimony

with evidence that Amber had brought out the blanket with the intention of having consensual

sex with petitioner, Amber was but one witness against petitioner.  The incident with Amber took

place nearly ten years prior to this trial.  This court cannot know just how much weight the jury

gave this evidence.  However, there are signs in the record that demonstrate the jury was focused

on the instant charges rather than past events.

The jury began deliberations on June 4, 1996 around 2:15 p.m.  (CT 314.)  During

deliberations on June 5, 1996, the jury asked the court questions:

> 1) Teresa's testimony about knife being pulled at Miller Park; 2)
> Baker's testimony why they were leaving Miller Park; 3) Teresa's
> testimony regarding knife at Front Street and sex acts; 4) Baker's
> testimony regarding sex acts at Front Street.

(CT 317.)  Counsel were notified and the reporters re-read the requested testimony to the jury.

(Id.)  Later that day, the jury asked:

> Does the knife have to be used in each consecutive act or is use established by his use to in effect start the acts, ie: once for the first act?"

(CT 317.)  The trial court "conferred with both counsel by conference call and sent the following reply to the jury: "While it need not be shown that the knife was used contemporaneously with each sexual assault, it must be shown that each act was accomplished by use of the knife."  (CT 317.)

On June 6, 1996, the jury sent a third request that read "Testimony from Jim Sheldon, Parks & Rec guy who spoke with Anji at the park."  (CT 325.)  "Counsel were notified of the request, and the reporter re-read the requested testimony to the jury.  (CT 325.)  Later that day, the jury sent the following note:

> 1.  We are not unanimous on the guilt of the defendant for count one, nor a lesser included offense.  We question the value of further deliberations.  The majority will not support a not guilty finding.  Is that the result if we conclude deliberations?  2.  We are not unanimous on the personal use of a weapon on all counts. Must we find that he did not use one if we lack unanimity?

(CT 325.)  "Counsel were notified to return to court."  (CT 325.)

The trial court attempted to ascertain whether the jury was deadlocked.  (RT 788.) One of the jurors inquired about the burden of proof and reasonable doubt.  (RT 789.)  The trial court instructed the jurors that "[e]fforts to couch reasonable doubt in terms of percentages have been condemned by the Courts.  It's not a percentage or mathematical quantification.  [¶]  It is a state of mind that involves an abiding conviction of the truth of the charges.  It's a state of mind, and it cannot be reduced to a numerical value."  (RT 789.)  The jury then retired to the jury room to complete filling out the verdict forms.  (RT 780.)

These jury questions reinforce this court's view that the jury was focused on the criminal charges levied against petitioner as to his conduct with Theresa, the victim in the instant action.  It appears the jury believed most of Theresa's testimony over petitioner's.

/////

Moreover, the jury was instructed that it "may not convict [petitioner] merely because you believe that he committed another offense or because you believe that he has a character trait that tends to predispose him to committing the charged offense." (RT 765.)  The instructions continued:

> Those assaults are not charged in this case and you may not find [petitioner] guilty of the charges here because you feel he should have been found guilty of the earlier alleged assault.  [¶]  You may, however, consider the evidence, to the extent you find it to be true, as tending to show [petitioner's] character or propensity to commit forced sexual assault.  [¶]  The question whether – before you, is whether [petitioner] is guilty of the crime charged in this case, not whether he's guilty of any other offense.  [¶]  You may return a verdict of guilty only if you are convinced beyond a reasonable doubt [petitioner] committed the offense charged against him in this case.  [¶]  For the limited purpose for which you may consider such evidence, you must weigh it as I have described in this instruction.  You are not permitted to consider such evidence for any other purpose.

(RT 765.)

For all of the foregoing reasons, this court cannot find that the exclusion of the testimony concerning the blanket had a substantial and injurious effect or influence in determining the jury's verdict.

### C.  Propensity Evidence (Claims 2d, 2e, 3 and 5)

The prosecution admitted evidence of sex assaults against Ida, Amber and Nicole, which were earlier charged but resulted in a hung jury, a dismissal before trial, and an acquittal, respectively.  (RT 527-28.)  Petitioner contends that the admission of this propensity evidence violated his due process right to a fair trial.  Petitioner also argues that the trial court abused its discretion in admitting the propensity evidence because the evidence was more prejudicial than probative.  Petitioner further contends the admission of this propensity evidence was fundamentally unfair and had a substantial and injurious effect on petitioner's case.

"[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."  Estelle v. McGuire, 502 U.S. at 67.  Because federal

habeas relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. <u>Drayden v. White</u>, 232 F.3d 704, 710 (9th Cir. 2000), <u>cert. denied</u>, 532 U.S. 984 (2001); <u>Spivey v. Rocha</u>, 194 F.3d 971, 977-78 (9th Cir. 1999), <u>cert. denied</u>, 531 U.S. 995 (2000); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991). Accordingly, an allegation that the trial judge's evidentiary ruling constituted a violation of Penal Code § 1108 or any other state law, standing alone, is not cognizable in this federal habeas corpus proceeding. <u>Middleton</u>, 768 F.2d at 1085. Accordingly, this court is called upon to determine only whether the admission of this evidence rendered petitioner's trial fundamentally unfair.

Although not entirely pertinent to this federal habeas corpus proceeding, this court notes that in 1999, the California Supreme Court held that California Evidence Code § 1108 is not invalid as a violation of due process because "the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence." <u>People v. Falsetta</u>, 21 Cal. 4th 903, 911-12 (1999) (quoting <u>People v. Fitch</u>, 55 Cal. App. 4th 172, 181-82 (1997)).[15] Similar federal statutes has also been upheld against a due process challenge. <u>See</u> <u>United States v. LeMay</u>, 260 F.3d 1018 (9th Cir. 2001), <u>cert. denied</u>, 534 U.S. 1166 (2002) (Fed. R. Evid. 414, permitting admission of evidence of similar crimes in child molestation cases, under which the test for balancing probative value and prejudicial effect remains applicable, does not violate the due process clause). The fact that petitioner was not actually convicted of a prior sex crime does not make the challenged evidence inadmissible. <u>Id.</u> at 1029. Rather, propensity evidence "will only sometimes violate the constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far outweighs what little relevance it might have." <u>LeMay</u>, 260 F.3d at 1027. <u>But</u> <u>cf.</u> <u>Garceau v. Woodford</u>, 275 F.3d 769 (9th Cir. 2001), <u>reversed on other grounds by</u>

---

[15] In <u>Fitch</u>, petitioner's argument based upon <u>In re Winship</u> was specifically rejected. 55 Cal. App. 4th at 182-83.

1  Woodford v. Garceau, 538 U.S. 202 (2003) (pre-AEDPA case holding that admission of prior

2  crimes evidence violated due process where jury was specifically instructed that the evidence

3  could be considered as evidence of defendant's character or his conduct on a specific occasion).

4          There is no exclusive list of factors that courts should evaluate in determining

5  whether to admit evidence of a defendant's prior acts of sexual misconduct.  Rather, judges

6  should consider factors relevant to individual cases, such as (1) the similarity of the prior acts to

7  the acts charged; (2) the closeness in time of the prior acts to the acts charged; (3) the frequency

8  of the prior acts; (4) the presence or lack of intervening circumstances and (5) the necessity of the

9  evidence beyond the testimonies already offered at trial.  LeMay, 260 F.3d at 1028; Doe ex rel.

10  Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1268 (9th Cir. 2000) (citing United States v. Guardia,

11  135 F.3d 1326, 1330 (10th Cir. 1998)).  "A court should pay 'careful attention to both the

12  significant probative value and the strong prejudicial qualities' of that evidence." LeMay, 260

13  F.3d 1027 (quoting Glanzer, 232 F.3d at 1268).

14          First, petitioner's claims that the trial court improperly permitted the use of prior

15  conduct for which he was acquitted or the charges were dismissed fails.  The United States

16  Supreme Court has expressly authorized the introduction of such evidence.  Dowling v. United

17  States, 493 U.S. 342, 349 (1990).[16]  Petitioner's claim that the propensity evidence deprived him

18  of the presumption of innocence because the other acts were proved by less than a reasonable

19  doubt standard fails under Dowling as well.  Id., 493 U.S. at 349.  The jurors were informed that

20  /////

21

---

22  [16]  The double jeopardy clause of the Fifth Amendment incorporates the doctrine of
collateral estoppel.  Ashe v. Swenson, 397 U.S. 436 (1970).  Collateral estoppel provides that

23  "when an issue of ultimate fact has once been determined by a valid and final judgment, that
issue cannot again be litigated between the same parties in any future lawsuit." Id. at 443.

24  However, the doctrine does not absolutely preclude the admission of relevant and probative
evidence at a subsequent proceeding simply because it relates to alleged criminal conduct for

25  which a defendant has been acquitted.  Dowling, 493 U.S. at 348.  The double jeopardy clause
protects against multiple prosecutions for the same offense; however, "the introduction of

26  relevant evidence of particular misconduct in a case is not the same thing as prosecution for that
conduct." United States v. Felix, 503 U.S. 378, 387 (1992).

1  the prior crimes did not result in conviction.  (RT 527-28.)  The court turns now to petitioner's

2  argument that the propensity evidence was more prejudicial than probative.

3          In the instant case, the record reflects that the trial judge struck a careful balance

4  between petitioner's rights and the clear intent of the California legislature that evidence of prior

5  similar acts be admitted in sexual assault prosecutions.  (See e.g. RT 15; 19-20; 30.)  Both sides

6  briefed the issue of admission of propensity evidence and the judge reviewed the briefs prior to

7  the hearing.  The trial judge also held a pre-trial hearing at which he discussed Penal Code

8  § 1101 and § 1108 and Evidence Code § 352.  (RT 13-37.)  The trial judge concluded that none

9  of the evidence was admissible under § 1101 and the evidence concerning Kelly Hogan was not

10  admissible at all.  (RT 18.)  The prosecution opted not to call another woman, Ms. Kolbert.  (RT

11  33.)  The trial judge further concluded that the testimony of Ida, Nicole and Amber was relevant,

12  particularly in light of petitioner's consent defense with regard to each alleged sexual assault.

13  For this reason, there was a rational inference the jury could draw from the challenged evidence

14  that was not constitutionally impermissible.

15          Moreover, the trial court instructed the jury at the close of the evidence that if they

16  found that petitioner had committed the prior sexual offenses against Ida, Nicole and/or Amber,

17  they could, but were not required to, infer that the defendant had a disposition to commit sexual

18  offenses.  The jury was also instructed that if they found that petitioner had such a disposition,

19  they could, but were not required to, infer that he was likely to have committed the charged

20  crimes.  Finally, the jury was directed that even if they found that petitioner committed a prior

21  sexual offenses that was not sufficient by itself to prove beyond a reasonable doubt that he

22  committed the charged crimes and that they were not to consider the evidence relating to the

23  other alleged victims for any other purpose.  In short, the record reveals that the trial judge

24  exercised his discretion to admit the evidence in a careful and judicious manner.

25          Petitioner contends the trial court erred by not sanitizing the propensity evidence

26  to reduce its prejudicial effect, comparing this case to People v. Harris, 60 Cal.App.4th 727

1   (1998).  However, the evidence here was nowhere near as prejudicial or inflammatory as the

2   vicious attack at issue in <u>Harris</u>.  Here, the trial judge was not required to sanitize the testimony

3   of Amber and Ida because Theresa alleged petitioner used a knife to compel her to have sex with

4   him and forced her to burn herself with a cigarette.  In light of those allegations, the gun use

5   allegation by Ida as well as the use of a broomstick allegation by Amber were not overly

6   prejudicial or inflammatory.  "Evidence introduced by the prosecution will often raise more than

7   one inference, some permissible, some not; we must rely on the jury to sort them out in light of

8   the court's instructions."  <u>Jammal</u>, 926 F.2d at 920 (footnote omitted).  Only if there are no

9   permissible inferences the jury may draw from the challenged evidence can its admission violate

10  due process.  <u>Id.</u>  Even then, the evidence must "be of such quality as necessarily prevents a fair

11  trial."  <u>Id.</u> (citation and internal quotation marks omitted).

12          The jury was allowed to use this evidence to bolster the truthfulness of the

13  victim's testimony and to counter petitioner's version that the sexual acts were consensual.  The

14  testimony of Ida and Amber was not so inflammatory or prejudicial to render petitioner's trial

15  fundamentally unfair.  Accordingly, habeas relief is not appropriate.

16          A further basis upon which the requested relief should be denied is that petitioner

17  has not shown that the California Courts' rejection of his due process claim was contrary to or an

18  unreasonable application of "clearly established Federal law, as determined by the Supreme

19  Court of the United States."  28 U.S.C. § 2254(d)(1).  It is not "clearly established Federal law"

20  that the admission of propensity evidence violates due process.  The Supreme Court has not

21  expressly held that it violates due process to admit other crimes evidence for the purpose of

22  showing conduct in conformity therewith, or that it violates due process to admit other crimes

23  evidence for other purposes without an instruction limiting the jury's consideration of the

24  evidence to such purposes.  Indeed, the Supreme Court has expressly declined to answer these

25  questions.  <u>See</u> <u>Estelle</u>, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no

26  opinion on whether a state law would violate the Due Process Clause if it permitted the use of

'prior crimes' evidence to show propensity to commit a charged crime"); Holgerson v. Knowles, 309 F.3d 1200, 1202 (9th Cir. 2002) (habeas relief not warranted unless due process violation clearly established by the Supreme Court);[17] see also Alberni v. McDaniel, 458 F.3d 860, 863-67 (9th Cir. 2006) (denying the petitioner's claim that the introduction of propensity evidence violated his due process rights under the Fourteenth Amendment because "the right [petitioner] asserts has not been clearly established by the Supreme Court, as required by AEDPA").  The state court's decision with respect to this claim is not contrary to United States Supreme Court precedent.  For all of the foregoing reasons, this claim should be denied.

D.  Right to Counsel - Marsden (Claim 6)

Petitioner claims that the trial court erred by denying his motion for new trial counsel.  Petitioner claims that the relationship between he and his appointed counsel inextricably broke down and, as a result, effective representation was no longer possible.  This claim is without merit and denial is recommended.

The California Court of Appeal addressed the denial of the pretrial motion for new counsel as follows:

> "[S]ubstitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." (*People v. Smith* (1993) 6 Cal.4th 684, 696.)
>
> This does not constitute grounds for substitution of counsel.

---

[17]   The Supreme Court has held that it is not a violation of due process to admit other crimes evidence, for purposes other than to show conduct in conformity therewith, where the jury is given a limiting instruction "that it should not consider the prior conviction as any evidence of the defendant's guilt on the charge on which he was being tried."  Spencer v. Texas, 385 U.S. 554, 558, 563-64 (1967); accord, Estelle, 502 U.S. at 74-75.  Petitioner's jury was given a comparable instruction.  (RT 765.)

Thus, [petitioner] cites *People v. Munoz* (1974) 41 Cal.App.3d 62, as supposedly commanding substitution of counsel. *Munoz,* however, said "if after appointment the attorney becomes convinced of his client's guilt *to the extent that he is unable to defend the client vigorously and effectively at the trial*, he should withdraw from the case." (Id. at p. 66, italics added.) Although *Munoz* suggested the trial court must inquire into counsel's state of mind (*ibid.*), the same court later clarified "inquiry into the attorney's state of mind is required only in those situations in which a satisfactory explanation for counsel's conduct or attitude toward his client is necessary in order to determine whether counsel can provide adequate representation." (*People v. Penrod* (1980) 112 Cal.App.3d 738, 747.)

Assuming counsel did believe [petitioner] was guilty, we see nothing suggesting her belief left her unable to defend her client vigorously and effectively at trial.

[Petitioner] complains counsel (1) referred to [petitioner's] fiancee and friend as "thugs"; (2) failed to investigate exonerating information, (3) failed adequately to cross-examine the victim (presumably at the preliminary hearing); and (4) after cross-examining the victim at trial, said to [petitioner] sotto voce, "What do you want me to do?  They, the jury, already hate you."

Assuming for the sake of argument that counsel made the comment attributed to her during trial, that would not provide a basis for overturning the trial court's decision on the *Marsden* motion, which was made before trial.  Moreover, there is nothing to suggest the asserted comment was heard by anyone other than [petitioner], and the comment itself does not demonstrate any impairment of the right to counsel.[18]

With respect to [petitioner's] other points, he gives no specifics as to what exonerating information counsel ignored, and he gives no examples of how cross-examination was deficient.  We are thus left only with the assertion that counsel referred to [petitioner's] friends as thugs.  In our view, this does not compel removal of counsel.

Moreover, with respect to all of [petitioner's] points, on appeal [petitioner] makes no cognizable claim of ineffective assistance of counsel.  The Supreme Court has said that where a defendant has not argued on appeal that trial counsel was incompetent, "we can

---

[18] In his reply brief, [petitioner] says the Attorney General cites no authority for his proposition that counsel for [petitioner] must renew his *Marsden* motion at trial.  However, it appears the point was that [petitioner] asks us to find an abuse of discretion by the trial court based on events occurring after the trial court exercised its discretion.  In any event, [petitioner] cites no post-motion event which would justify replacement of counsel.

infer his *Marsden* motion lacked substance because ineffective assistance of counsel is the foundation which supports the *Marsden* rule." (*People v. Brown* (1988) 46 Cal.3d 432, 461.)

In his reply brief, [petitioner] says he has claimed ineffective assistance of counsel, by including in his *Marsden* argument specific complaints about his attorney's performance, i.e., failure to investigate exonerating information and failure adequately to cross-examine a witness. However, this does not constitute an ineffective assistance of counsel argument. Such an argument would have to be supported by a factual and legal analysis of the law concerning reversals due to ineffective assistance of counsel. (E.g., *People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 (appellate court may disregard contentions not adequately briefed, such as claims perfunctorily asserted without development and without clear indication that they are intended to be discrete contentions].)

[Petitioner] also claims he raised an ineffective assistance of counsel argument by citing *People v. Stankewitz* (1982) 32 Cal.3d 80, for its statement that "'to compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever.'" (Id. at p. 94.) However, this statement (made in a discussion concerning the [petitioner's] challenge to the trial court's denial of his request for a competency hearing) does not suggest that a *Marsden* claim is the same as an ineffective assistance of counsel claim.

We conclude [petitioner] fails to show any significant impairment of his right to counsel.

People v. Baker, slip op. at 11-15. Petitioner expanded his claim to include an ineffective assistance of counsel claim, filed in the California Supreme Court, which issued a denial without comment. The court will analyze these claims separately.

        i. Marsden Motion

        The Sixth Amendment to the Constitution guarantees the right to effective and competent assistance of counsel in a criminal prosecution. Strickland v. Washington, 466 U.S. 668 (1984). Where a defendant is proceeding with the assistance of counsel, he may move to dismiss or substitute counsel, whether appointed or retained. The grant or denial of such a motion may depend on its timeliness and the nature of the conflict between the defendant and current counsel. United States v. McClendon, 782 F.2d 785, 789 (9th Cir. 1986). In assessing on

45

direct appeal a federal trial court's decision to deny a motion to substitute counsel, the court looks at three factors: "'(1) timeliness of the motion to dismiss counsel; (2) the adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense.'" Id. (quoting United States v. Mills, 597 F.2d 693, 700 (9th Cir. 1979)). See also, United States v. Musa, 220 F.3d 1096, 1102 (9th Cir. 2000).  A denial of a motion for substitution of counsel on the first day of trial will be upheld where there is insufficient showing of conflict with current counsel.  McClendon, 782 F.2d at 789.  Additionally, it is within a trial judge's discretion to deny a motion to substitute made on the eve of trial if the substitution would require a continuance.  Id.

In assessing such a claim in the context of a habeas corpus proceeding, the focus is different than that on direct review.  In Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000) (en banc) the court stated:

> Our primary reason for accepting this case for en banc review was to correct the standard of review we have been using to examine the constitutionality of a state court's handling of a motion to substitute appointed counsel based on allegations of an irreconcilable conflict.  In Bland, we said that the test is whether a state court's denial of such a motion was for an "abuse of discretion." Bland, 20 F.3d at 1475.

> * * *

> [O]ur only concern when reviewing the constitutionality of a state-court conviction is whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  See also Coleman v. Thompson, 501 U.S. 722, 730, 111 S.Ct. 2546. 115 L.Ed. 640 (1991) ("The [habeas] court does not review a judgment but the lawfulness of the petitioner's custody simpliciter.") (emphasis in original).  A particular abuse of discretion by a state court may amount also to a violation of the Constitution, but not every state court abuse of discretion has the same effect.  Accordingly, to the extent that they conflict with this opinion, we overrule Bland and Crandell v. Bunnell, 144 F.3d 1213 (9th Cir. 1998).

Id. at 1024-25 (footnotes omitted).  In Schell the court determined that it was "well established

46

and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds of such a motion, and that the matter be resolved on the merits before the case goes forward."  218 F.3d at 1025; see also Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir. 1982) ("Thus, the state trial court's summary denial of a defendant's motion for new counsel without further inquiry violated the Sixth Amendment.")

Under such an inquiry, the state court's handling of the motion for new trial counsel in this case passes constitutional muster.  On April 30, 1996, petitioner's motion was heard in closed session before a judge who did not preside over petitioner's trial.  (Weaver Decl., Ex. 1, 1-5.)[19]  The judge allowed petitioner the opportunity to fully explain on the record his problems with his attorney.  (Weaver Decl., Ex. 1, 1-5.)  The court focused on and fully explored the nature of the conflicts expressed by petitioner.  The undersigned finds that the court made an adequate inquiry into petitioner's complaints and resolved the matter on the merits before proceeding with the case.

This does not end the inquiry.  According to the court in Schell:

> Thus, the ultimate question the federal courts must answer here is not whether the state trial court "abused its discretion" in not deciding [defendant's] motion, but whether this error actually violated [defendant's] constitutional rights in that the conflict between [defendant] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment.

Id. at 1026.  Here, trial counsel met this standard, providing effective pretrial assistance to petitioner.  Trial counsel affirmed before the court that she was able to represent petitioner. (Weaver Decl., Ex. 1, at 6-7.)  She explained that she was in the process of filing a "lengthy two-part motion regarding the 1108 witnesses."  (Weaver Decl., Ex. 1 at 7.)  Indeed, at the pretrial

---

[19]  Because the Marsden hearing was sealed, the reporter's transcript of the hearing was obtained by petitioner's counsel and appended as Exhibit 1 to counsel's declaration filed December 20, 2004.  (Hereafter "Weaver Decl., Ex. 1.")

hearing on the admission of propensity evidence, the trial judge remarked on at least two occasions about the high quality of briefing both counsel provided on the issue of propensity evidence.  (RT 13-14; 37-38.)  Trial counsel explained no other motion was appropriate based on the facts of this case.  Trial counsel had received over a thousand pages of discovery.  (Weaver Decl., Ex. 1 at 6-7.)

Trial counsel further explained that she "never intentionally lied to Mr. Baker." (Weaver Decl., Ex. 1 at 7.)  She unequivocally denied sharing information with the prosecution, other than trial dates or other procedural matters.  (Weaver Decl., Ex. 1 at 7.)

Petitioner's complaints focused upon his perception that trial counsel thought he was guilty and was not performing tasks petitioner thought she should.  (Weaver Decl., Ex. 1 at 5.)  However, the judge found petitioner to be not credible:  "if I were to be a trial judge in this case and you were to continue to bring this type of frivolous motion I wouldn't even let you bring it."  (Weaver Decl., Ex. 1, at 8.)

Petitioner is not entitled to a "meaningful relationship with his attorney," Morris v. Slappy, 461 U.S. 1, 13-14 (1983), but rather, effective representation.  Counsel's pretrial performance was competent and there is no evidence that any doubts about petitioner's guilt or innocence negatively influenced her performance.  Furthermore, disagreement does not warrant relief as petitioner only has a right to effective representation, not to an attorney who shares his opinion on trial tactics.  See United States v. Mejia-Mesa, 153 F.3d 925, 931 (9th Cir. 1998); see also Schell, 218 F.3d at 1026 n.8 (quoting Brookhart v. Janis, 384 U.S. 1, 8 (1966)(Harlan, J., dissenting in part))("'[A] lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval.'").  Although petitioner faults counsel for failing to pursue numerous motions, there is no indication such motions would have been fruitful.  Finally, trial counsel prepared for trial and was able to skillfully represent petitioner when required.

/////

1    A conflict which causes problems in some area of the attorney-client relationship

2 but which ultimately has no significant impact on counsel's representation before the court does

3 not constitute ineffective assistance.  See Cuyler v. Sullivan, 446 U.S. 335, 348-350 (1980); see

4 also United States v. Mett, 65 F.3d 1531, 1535 (9th Cir.1995).  Under the circumstances

5 presented here, the trial court did not err in denying petitioner's request for new counsel.  See

6 United States v. Robinson, 913 F. 2d 712, 716 (9th Cir. 1990) (no error in failing to offer

7 defendant substitute counsel where the crux of the problem was defendant's anger at his

8 attorney's refusal to raise defenses to the charges which the attorney considered frivolous); see

9 also United States v. Padilla, 819 F.2d 952, 956 (10th Cir. 1987) (finding that defendant's

10 complaints that his appointed counsel refused to structure a defense as he directed did not

11 constitute good cause for substitution of counsel and stating, "there is no absolute right to

12 counsel of one's choice").  Accordingly, the state court's ruling was neither contrary to nor an

13 unreasonable application of Federal law.  Petitioner's Marsden claim concerning the denial of his

14 motion for new counsel should be denied.

15    ii.  Ineffective Assistance of Trial Counsel

16    Petitioner claims that his trial counsel rendered ineffective assistance when she

17 failed to cross-examine Theresa as to her inconsistent statements, and when she failed to object,

18 during closing argument, to the prosecution's improper characterization of how propensity

19 evidence could be used by the jury.

20    The Sixth Amendment guarantees the effective assistance of counsel.  The United

21 States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

22 Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

23 counsel, a petitioner must first show that, considering all the circumstances, counsel's

24 performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

25 identifies the acts or omissions that are alleged not to have been the result of reasonable

26 professional judgment, the court must determine whether, in light of all the circumstances, the

identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).

Petitioner claims there were numerous inconsistencies in Theresa's statements to the police, her preliminary hearing testimony and her trial testimony adding up to constitute three different stories.[20]  Petitioner contends trial counsel failed to point out and focus on these inconsistencies to demonstrate that Theresa's story "evolved as the facts of the case became more developed, thereby undermining the reliability of her story as a whole." (Supp. Mem. at 45.) Petitioner argues that trial counsel's response "What do you want me to do?  They, the jury, already hate you" meant "that further cross-examination was pointless because the jury had already convicted him." (Id.)

However, a review of the cross-examination does not reflect such a defeatist attitude on the part of trial counsel.  (RT 397-431.)  As petitioner points out, trial counsel raised the inference that Theresa was a prostitute and focused on rebutting the allegation that petitioner had kidnaped Theresa.  (RT 398-434.)  Counsel emphasized that Theresa accompanied petitioner voluntarily and did not flee despite numerous opportunities to do so.  (Id.)  Although counsel did not come right out and ask Theresa whether she had given different versions of the facts on three

---

[20] The example of an inconsistent statement cited by petitioner was incorrect.  At his sentencing hearing, petitioner stated Theresa told the police he used a knife to fix his car speakers but said he used a screwdriver at trial.  (RT 807.)  On direct examination, Theresa testified that petitioner was fixing his car speaker: "So he got out and fixed it with – and he had some tools in the back of his car.  So he fixed the speaker and everything was going all right."  (RT 369-70.) But on cross-examination, Theresa stated petitioner used a knife to fix his speaker (RT 402), which was consistent with her earlier statement to the police officer.

1  separate occasions, counsel uncovered numerous inconsistencies in Theresa's details.  Counsel

2  pointed out that

3  •      Theresa had not previously described her jeans as baggy.  (RT 400-01.)

4  •      Theresa didn't testify on direct about a hug and didn't tell the police that

5         petitioner and she had hugged.  (RT 407; 409)

6  •      At the preliminary hearing, Theresa stated she allowed petitioner to put his hand

7         on her knee "only for a few minutes"; at trial, she testified it was only a minute.

8         (RT 410.)

9  •      Theresa had told the police petitioner climbed over her to exit the car as opposed

10        to her testimony that he had gotten out, gone around and opened the passenger

11        door.  (RT 421-22.)

12 •      Theresa testified to different numbers of times oral copulation had occurred. (RT

13        425.)

14 •      Theresa's statements concerning the location of the knife had differed.  (RT 427-

15        28.)

16 •      On direct exam, Theresa stated petitioner burned her with the cigarette; on cross-

17        examination she clarified that she had burned herself, under direction by

18        petitioner.  (RT 428-29.)

19 •      Theresa had failed to tell the police officer that she and petitioner stopped at a

20        store after the alleged rape.  (RT 431.)

21 Moreover, in closing argument, trial counsel again noted some of the specific inconsistencies

22 (RT 712, 713, 714, 717, 718) and told the jury Theresa had "lied to you."  (RT 713.)  Trial

23 counsel asked the jury to "examine the evidence, talk about the inconsistencies."  (RT 727.)

24 Counsel stated "These women are lying."  (RT 728.)

25        On this record, the court cannot find that trial counsel's performance fell outside

26 "the wide range of professionally competent assistance" that the Sixth Amendment requires

1   simply because she failed to impeach Theresa with her inconsistent statements in the manner

2   petitioner felt she should.  This claim should be denied.

3               E.  Prosecutorial Misconduct & Ineffective Assistance of Counsel (Claims 2a & 7)

4               Petitioner contends that prosecutorial misconduct rendered his trial fundamentally

5   unfair and that trial counsel was ineffective because she failed to object when the prosecutor

6   overstated the purpose of the propensity evidence.  Petitioner cites the prosecution's statement "I

7   know that defendant did it on this occasion because he's done it on past occasions."  (RT 684.)

8               In the instant case, petitioner's claim of prosecutorial misconduct was procedurally

9   defaulted under California law, for counsel's failure to object contemporaneously.  Accordingly,

10  the federal court may not review the claim.  Coleman v. Thompson, 501 U.S. 722, 729 (1991).

11  In addition, no precedent of the United States Supreme Court requires reversal of a conviction

12  when the state court's instructions properly explain the applicable law, but the prosecutor

13  misstates the law in argument.  Cf. Boyde v. California, 494 U.S. 370, 384-85 (1990)

14  ("[P]rosecutorial misrepresentations . . . are not to be judged as having the same force as an

15  instruction from the court.").  Because there is no controlling Supreme Court precedent, the state

16  court's decision on the issue of prosecutorial misconduct cannot be contrary to, or an

17  unreasonable application of, clearly established federal law under 28 U.S.C. § 2254(d).  Kane v.

18  Garcia Espitia, 546 U.S. 9 (2005) (per curiam).

19              However, even assuming, *arguendo*, that petitioner's counsel had objected, the

20  claim of prosecutorial misconduct would fail.

21              Federal habeas review of prosecutorial misconduct is limited to the issue of

22  whether the conduct violated due process.  See Darden v. Wainwright, 477 U.S. 168, 181 (1986);

23  Sassounian v. Roe, 230 F.3d 1097, 1106 (9th Cir. 2000).  Prosecutorial misconduct violates due

24  process when it has a "substantial and injurious effect or influence in determining the jury's

25  verdict."  See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996) (quoting O'Neal v.

26  McAninch, 513 U.S. 432, 443 (1995)).  A claimant must show "first that the prosecution engaged

1  in improper conduct and second that it was more probable than not that the prosecutor's conduct

2  'materially affected the fairness of the trial.'"   United States v. Smith, 893 F.2d 1573, 1583 (9th

3  Cir. 1990) (quoting United States v. Polizzi, 801 F.2d 1543, 1558 (9th Cir. 1986)).  If left with

4  "grave doubt" whether the error had substantial influence over the verdict, a court must grant

5  collateral relief.  Brecht v. Abrahamson, 507 U.S. 619, 631 (1993); Ortiz-Sandoval, 81 F.3d at

6  899.

7          In order to determine whether the prosecutor engaged in misconduct during his

8  closing argument to the jury, it is necessary to examine the entire proceedings and place the

9  prosecutor's remarks in context.  See Greer v. Miller, 483 U.S. 756, 765-66 (1987).  In

10  fashioning closing arguments, prosecutors are allowed "reasonably wide latitude," United States

11  v. Birges, 723 F.2d 666, 671-72 (9th Cir. 1984), and are free to argue "reasonable inferences

12  from the evidence."  United States v. Gray, 876 F.2d 1411, 1417 (9th Cir. 1989).  See also

13  Duckett v. Godinez, 67 F.3d 734, 742 (9th Cir. 1995).  "[Prosecutors] may strike 'hard blows,'

14  based upon the testimony and its inferences, although they may not, of course, employ argument

15  which could be fairly characterized as foul or unfair."  United States v. Gorostiza, 468 F.2d 915,

16  916 (9th Cir. 1972).

17          Here, the prosecutor's statement was made while he was explaining to the jury the

18  concept of propensity evidence.  His closing argument stated, in pertinent part:

19          Propensity evidence is a form of character or circumstantial
           evidence.  [¶]  Basically if it is established in the past [petitioner]
20          has engaged in forced sexual conduct with other females, if you
           should find that to be true, you can add that on the balance.  You
21          can say to yourselves, "I know [petitioner] did it on this occasion
           because he's done it on past occasions."
22
           I use the term "rapist" here loosely because rape, technically
23          speaking, is sexual intercourse, and that's not one of the charges
           involved in this case.  [¶]  But if you use the term "rapist" loosely,
24          to include all forms of forced sexual conduct, that's what we have
           here.  [¶]  We're proving [petitioner] raped because he is a rapist.
25          We're proving [petitioner] raped because he is a rapist.  That, in
           summary, establishes, what propensity evidence is all about.

26

1        Now, there are a couple of steps you have to go through with
2        regard to propensity evidence.  His Honor is going to instruct you
        about.  [¶]

3  (RT 684.)  The prosecution's statement did misstate how the propensity evidence could be used

4  by the jury.  However, on the record as a whole, this court cannot find that it was more probable

5  than not that the prosecutor's statement materially affected the fairness of the trial.

6        Here, the jury was instructed that "[s]tatements made by the attorneys during the

7  trial are not evidence."  (RT 757.)  The trial court took extra care to craft jury instructions that

8  properly defined the use of propensity evidence, reinforced the fact that the jury had to find

9  petitioner guilty of the present offenses beyond a reasonable doubt, specifically admonishing the

10  jury that it "may not convict [petitioner] merely because you believe that he committed another

11  offense or because you believe that he has a character trait that tends to predispose him to

12  committing the charged offense."  (RT 765.)  In addition, as noted above, the jury questions

13  posed during deliberations indicated that the jury was focused on the allegations raised by

14  Theresa, not from the propensity evidence.  Thus, the prosecutor's misstatement does not rise to

15  the level of actional prosecutorial misconduct.

16        This claim fails in the context of ineffective assistance of counsel as well.

17  Petitioner contends the prosecution's statement misstated the law because it informed the jury it

18  was permitted to convict petitioner of the present offense on the basis of evidence of past

19  offenses that it was not required to find true by the reasonable doubt standard.  Trial counsel's

20  failure to object to the prosecution's statement, therefore, was ineffective assistance of counsel.

21        As noted above, petitioner must show that, considering all the circumstances,

22  counsel's performance fell below an objective standard of reasonableness, and demonstrate that

23  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

24  proceeding would have been different."  Strickland v. Washington, 466 U.S. 668 (1984).

25        Petitioner's trial counsel should have objected to the prosecution's

26  characterization of the use of propensity evidence by the jury.  Given the critical nature of the

1  propensity evidence in this case, trial counsel should have been alert to the prosecution's

2  description of how the jury could use this evidence.

3          However, having reviewed the record, this court cannot find that but for trial

4  counsel's failure to object, the outcome of this case would have been different.  The trial court

5  ensured by its instructions that it was made clear to the jury how the propensity evidence could

6  be used.  (RT 765.)  The court also made clear that attorneys' statements were not evidence.  (RT

7  757.)  Even if trial counsel had objected, the trial court would have simply issued an

8  admonishment or curative instruction.  On this record, the court cannot find that but for counsel's

9  objection to the prosecution's statement the outcome of these proceedings would have been

10 different.  This is true notwithstanding petitioner's citation to Gibson v. Ortiz, 387 F.3d 812 (9th

11 Cir. 2004).  In Gibson, the misstating of the law was contained in the court's own jury

12 instruction, which bears greater weight than a prosecutor's argument.  See Boyde v. California,

13 494 U.S. 370, 384-85 (1990).  Accordingly, this court cannot find trial counsel was ineffective

14 for failing to object to the prosecutor's misstatement concerning the use of propensity evidence.

15              F.  Admission of Photos (Claim 2b)

16          Petitioner contends that the admission of photos (trial exhibits 47, 48 and 49)

17 rendered petitioner's trial fundamentally unfair.  These exhibits depict the anus of alleged victim

18 Theresa and a picture taken during an anus scope of Theresa (exhibit 48).  Petitioner argues their

19 admission was improper because the photos were inflammatory, irrelevant and were more

20 prejudicial than probative.  Petitioner also protests the admission of photos of alleged prior

21 victims Nicole R. and Amber H. (trial exhibits 33 - 36.)  Petitioner contends the testimony of

22 Nicole R. and Amber H. was lengthy and detailed, rendering the admission of their photos

23 cumulative.  Petitioner argues that the photos were also inflammatory and designed to prejudice

24 the jury.

25          Respondent contends the decision to admit evidence of other sex crimes was

26 proper and therefore the decision to admit the photos was also proper.

1    No state court issued a reasoned opinion supporting rejection of this claim.

2    The admission of evidence at trial may violate due process only if "there are no

3    permissible inferences the jury may draw from the evidence." Jammal v. Van de Kamp, 926

4    F.2d 918, 920 (9th Cir. 1991).  The review on habeas is very limited; the court considers only

5    whether the admission of the challenged evidence "so fatally infected the proceedings as to

6    render them fundamentally unfair." Id. at 919.  Moreover, "[t]he fact that evidence admitted as

7    relevant by a court is shocking to the sensibilities of those in the courtroom cannot, for that

8    reason alone, render its reception a violation of due process." Lisenba v. California, 314 U.S.

9    219, 228-29 (1941).

10    In the instant case, the trial judge found that the photographs in exhibits 47-49

11    were not gruesome, shocking, dismaying or upsetting because of violence.  (RT 499.)  The trial

12    judge found the photographs were intimate, but noted that the prosecution had to prove

13    penetration.  (RT 499.)  The prosecution anticipated Laurie Parker, RN, would testify that the

14    photographs demonstrate the victim had injuries consistent with a forceful act.  (RT 500.)  The

15    trial court found that the photographs had probative value and that the prejudicial affect did not

16    outweigh the probative value.  (RT 500.)

17    Nurse Parker testified that the pictures from the anus scope revealed very bright

18    red tissue, "increased vascularity," which denotes redness or bruising unlike the normal tissue

19    which appears pink.  (RT 504, 506.)  Nurse Parker testified that she had seen these injuries

20    before only in patients who have complained of either penetration through their anus into their

21    rectum with a body part or with a foreign object.  (RT 506.)  Nurse Parker further testified that

22    she had noted her examination of the victim proved consistent with the victim's history; that is,

23    Theresa's injuries were consistent with an act of forcible sodomy.  (RT 505-06.)  On cross-

24    examination, Nurse Parker testified that abrasions and tears could also be consistent with

25    consensual sex.  (RT 512.)  While pressed to admit that she was not present during the sex act,

26    Nurse Parker explained that based on patient interviews and reading literature regarding sexual

1  assault, "consensual activities usually do not leave . . . injuries, or the patient usually did not

2  experience pain following the episode." (RT 513.) Nurse Parker agreed that if lubrication were

3  not used during consensual anal intercourse, "there might be some discomfort." (RT 513.)

4  This testimony raised a permissible inference that Theresa suffered nonconsensual

5  anal penetration. The photographs bolstered this testimony as well as the testimony of Theresa.

6  Because there were no witnesses, and petitioner was contending the sexual activity was

7  consensual, this evidence was probative on the issue of anal penetration, possible use of force,

8  and injuries. The introduction of gruesome photographs does not by itself raise "the specter of

9  fundamental unfairness such as to violate due process of law." Gerlaugh v. Stewart, 129 F.3d

10  1027, 1032 (9th Cir.1997) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)). The

11  introduction of these photographs depicting Theresa's injuries in the instant case does not compel

12  a different conclusion.

13  The admission of the photographs of the other alleged victims, Nicole R. and

14  Amber H., was probative as to the use of force and the extent of injuries inflicted and, in view of

15  other properly admitted evidence and the court's limiting instructions, it cannot be said that their

16  admission rendered the trial fundamentally unfair in violation of due process. Accord

17  Kealohapauole v. Shimoda, 800 F.2d 1463, 1465-66 (9th Cir.1986) (videotape of victim's

18  autopsy, although unpleasant, not so inflammatory as to inject element of unfairness); Batchelor

19  v. Cupp, 693 F.2d 859, 865 (9th Cir.1982) (nude photographs of victim did not render trial

20  fundamentally unfair in violation of due process).

21  Thus, this court cannot find that the admission of these photographs rendered

22  petitioner's trial fundamentally unfair.

23  G.  Ineffective Assistance of Appellate Counsel (Claim 11)

24  Petitioner contends he received ineffective assistance of appellate counsel when

25  his appellate attorney failed to raise a claim based on the alleged improper admission of

26  photographic evidence.

1   No state court issued a reasoned opinion supporting rejection of this claim.

2   The Strickland standards apply to appellate counsel as well as trial counsel. Smith

3   v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

4   However, an indigent defendant "does not have a constitutional right to compel appointed

5   counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

6   professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751

7   (1983). Counsel "must be allowed to decide what issues are to be pressed." Id. Otherwise, the

8   ability of counsel to present the client's case in accord with counsel's professional evaluation

9   would be "seriously undermined." Id. See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

10  Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

11  not even particularly good appellate advocacy.") There is, of course, no obligation to raise

12  meritless arguments on a client's behalf. See Strickland, 466 U.S. at 687-88 (requiring a

13  showing of deficient performance as well as prejudice). Thus, counsel is not deficient for failing

14  to raise a weak issue. See Miller, 882 F.2d at 1434. In order to demonstrate prejudice in this

15  context, petitioner must demonstrate that, but for counsel's errors, he probably would have

16  prevailed on appeal. Miller, 882 F.2d at 1434, n.9.

17  Because this court has found that the admission of the photographic evidence was

18  appropriate, this court cannot find appellate counsel was ineffective for failing to raise this claim

19  on appeal.

20  In accordance with the above, IT IS HEREBY RECOMMENDED that

21  petitioner's application for writ of habeas corpus be denied.

22  These findings and recommendations are submitted to the United States District

23  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within ten days

24  after being served with these findings and recommendations, any party may file written

25  objections with the court and serve a copy on all parties. Such a document should be captioned

26  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 4, 2007.

UNITED STATES MAGISTRATE JUDGE

/001;bake0804.157